[No. 30339. Department Two. January 9, 1948.]

Agnes Norma Kellerher, *as Administratrix, Respondent,* v. John B. Porter *et al., Appellants.*[1]

[1]Reported in 189 P. (2d) 223.

654

*Kahin & Carmody* (*Muriel Mawer*, of counsel), for appellants.

*John J. Kennett* and *Shorett, Taylor & Revelle*, for respondent.

*Marion Garland, Sr., Marion Garland, Jr.,* and *Frank Hunter, amici curiae.*

STEINERT, J.—Plaintiff, as administratrix, brought suit against the defendants John B. Porter, individually, and the marital community of which he was a member, and against John B. Porter and Elmer R. Porter, a copartnership, doing business under the firm name of Porter Clinic, to recover damages for the death of plaintiff's husband, resulting from a collision between an automobile driven by defendant John B. Porter and an automobile driven by the decedent James Joseph Kellerher.

The complaint alleged that the accident was caused by the negligence of defendant John B. Porter in that, while

driving his automobile at a speed of sixty miles an hour, he suddenly and without warning swerved his car sharply to his left, across the center line of the highway, onto the opposite side, where it came into violent collision with the automobile driven by the decedent, causing the latter's death. The answer of the defendants denied this allegation and further alleged, affirmatively, that the accident and consequent injuries and damages were caused by the negligence of the deceased in the following respects, among others: (1) driving too close to a car ahead of him, making it necessary for him to turn out to his left when that other car slowed down; (2) driving on the wrong, or left, side of the highway and blocking the right of way of defendant John B. Porter; (3) driving at an illegal and unreasonable rate of speed, under the existing circumstances; and (4) driving while under the influence of intoxicating liquor.

Plaintiff in her reply denied these affirmative allegations. Upon a trial of the issues thus raised, the jury returned a verdict in the sum of seventy thousand dollars in favor of plaintiff and against the defendants John B. Porter, individually, the marital community, and Elmer R. Porter. The court entered judgment on the verdict, and the defendants appealed.

Thirteen assignments of error are set forth in appellants' brief. The order in which we shall number and consider them will be somewhat different from that in which they are presented by the appellants.

The first two assignments are that the court erred in denying appellants' challenge to the sufficiency of the evidence at the close of respondent's case, and in denying appellants' motion for judgment notwithstanding the verdict.

A challenge to the sufficiency of the evidence, a motion for nonsuit, a motion for directed verdict, or a motion for judgment notwithstanding the verdict admits the truth of the evidence of the party against whom the challenge or motion is made and all inferences that reasonably can be drawn from such evidence, and requires that the evidence be interpreted most strongly against the challenger or

movant party and in the light most favorable to the opposing party. *Billingsley v. Rovig-Temple Co.,* 16 Wn. (2d) 202, 133 P. (2d) 265, and cases therein cited; *Fiskaa v. Miller,* 27 Wn. (2d) 242, 177 P. (2d) 707.

With this rule in mind in our consideration of these two assignments of error, we shall state the pertinent facts as the jury was entitled to find them from the evidence.

The accident with which we are here concerned occurred April 4, 1946, about 7:10 p. m., at a point approximately one mile south of Port Orchard, in Kitsap county, on state highway No. 14, which extends between Port Orchard and Bremerton. Although Port Orchard is situated in a southerly direction, and eastwardly across the bay, from Bremerton, the highway in the vicinity of the scene of the accident runs in a northerly course toward Port Orchard and in a southerly course toward Bremerton. In that locality, it is a paved, level, two-lane roadway, twenty feet in width, with a yellow stripe along the center; bordering the pavement on the east is a seven-foot shoulder; bordering the pavement on the west is a fourteen-foot shoulder, beyond and about five feet below which is a shelf of earth.

At the time of the accident, it was dark; the weather, however, was clear, and the road was dry. Just prior to the occurrence, four automobiles were traveling along the highway in the immediate vicinity of the place here involved. They were: (1) the car which the deceased, James Joseph Kellerher, was driving, alone, from Bremerton toward Port Orchard; (2) an official car of the Port Orchard police department, driven by Robert Heath, with whom were riding his wife and his father, Charles A. Heath, chief of police of Port Orchard, which car was also traveling from Bremerton toward Port Orchard, and which was about one hundred feet ahead of decedent's car; (3) the car which the appellant Dr. John B. Porter was driving, alone, from Port Orchard toward Bremerton; and (4) a car driven by Charles H. Downey, who was accompanied by two other men, proceeding from Port Orchard toward Bremerton, ahead of the car driven by Dr. Porter. These four automobiles will herein-

after be referred to by the surnames of their respective drivers.

The Heath and Kellerher cars, proceeding northwardly, in the order stated, toward Port Orchard, were traveling at a speed of approximately forty or forty-five miles an hour; the Downey car, proceeding southwardly toward Bremerton, was also traveling at a speed of forty or forty-five miles an hour, while the Porter car, proceeding in the same direction and following the Downey car, was traveling at a speed of fifty or sixty miles an hour.

As the four cars approached each other in this manner, the Porter car moved into its left-hand, or the east, lane of the highway and began passing the Downey car. At that time, the Heath car, approaching from the opposite direction along the east lane, was about one hundred or one hundred twenty-five feet distant from the Downey car and, in order to avoid a collision with the Porter car, swung to its right-hand side onto the east shoulder of the highway; in this manner the Heath car successfully passed the Porter car. About that same time, the driver of the Downey car, seeing the situation and being fearful of becoming involved in a collision, pulled over to his right-hand side onto the west shoulder of the highway, applied his brakes, and brought his car to a stop. In consequence of this precaution on Downey's part, he was successfully passed by the Porter car going in the same direction, and by the Heath car going in the opposite direction. This left the Kellerher car and the Porter car, which were approaching each other from opposite directions, still traveling along and upon the paved portion of the highway, the Kellerher car occupying its proper, or the east, lane of the highway, and the Porter car also occupying the east lane to the extent of approximately two thirds of the car's width and straddling the yellow stripe in the center of the road, but traveling at an increased speed of sixty miles an hour. The two cars were then less than one hundred feet apart and were approaching each other at a combined speed of approximately one hundred miles an hour.

Immediately before the collision between these two auto-

mobiles, Kellerher, confronted with the situation as just described, swung his car abruptly to the left, or the west, at an angle of approximately forty degrees, so that the left front wheel, and possibly the right front wheel, of his car was across the center line and in the west lane of the highway. While in that position, the Kellerher car was struck by the Porter car, the impact being on the right-hand side of the Kellerher car, just in front of the right rear fender, pinning Kellerher against the steering wheel.

The Kellerher car came to rest with its rear end hanging over the west shoulder of the highway and extending down upon the lower shelf of earth, the car being headed in a northeasterly direction. The Porter car came to rest entirely on the west shoulder, and headed in a northwesterly direction. The two cars stood about four feet apart.

Both cars were wrecked. Mr. Kellerher received critical injuries from which he died five hours later. Dr. Porter was rendered unconscious and was otherwise seriously hurt. Although he had recovered and was able to testify at the trial, he remembered nothing about the accident.

The occupants of the Downey car, who were facing the two colliding cars at the time of, and immediately prior to, the impact, testified for the respondent; the occupants of the Heath car, who at best had a view of the collision from the rear of their car, testified for the appellants.

The argument of the appellants on their two initial assignments of error is based upon the alleged fact that the front wheels of the Kellerher car had crossed the center line of the road and the car was to that extent on the wrong side of the highway at the time of the collision. From this fact, appellants contend that Kellerher was guilty of contributory negligence as a matter of law, requiring dismissal of the case.

We do not agree with appellants' contention. In our opinion, the jury could properly have found, from the evidence outlined above, that the situation with which Kellerher was confronted immediately before the collision was one of sudden peril, and that his act of pulling sharply to his

left instantly before the impact was a frantic effort to escape the Porter car headed in his direction and bearing. down upon him, or else that he was endeavoring to avoid injury to himself personally by exposing the right-hand side of his car, rather than the front or the left-hand side, to the force of the onrushing Porter car, thus constituting an act impelled by sudden emergency.

The rule of "sudden emergency," as it has been stated by this court, is that an automobile driver who, by the negligence of another and not by his own negligence, is suddenly placed in a situation of emergency and compelled to act instantly to avoid a collision or injury, is not guilty of negligence if he makes such a choice of action as a person of ordinary prudence placed in such a position *might* make, even though he does not make the wisest choice or one that would have been required in the exercise of ordinary care, but for the emergency. *Ruff v. Fruit Delivery Co.,* 22 Wn. (2d) 708, 157 P. (2d) 730; *Mahoney v. Canafax,* 23 Wn. (2d) 869, 162 P. (2d) 903; *Kelly v. Kittitas County, ante* p. 383, 187 P. (2d) 297. Accord: *Dupea v. Seattle,* 20 Wn. (2d) 285, 147 P. (2d) 272.

We are of the further opinion that, under the evidence as heretofore set forth, the jury could have found that the collision would have occurred regardless of whether or not the Kellerher car had crossed the center line of the highway to the extent that it did. The impact was upon that portion of the Kellerher car which was still upon its own right side of the highway.

In this connection, appellants strenuously argue that, taking the testimony in the aspect most favorable to respondent, the collision could not, as a mathematical proposition, have occurred in the manner asserted by the respondent. This argument is predicated upon the relative distances between the various cars at certain times and places and the various rates of speed at which they were traveling, as testified by respondent's witnesses.

It is obvious that the testimony with reference to these matters could have been, and was, only an estimate. We

are fully satisfied that, from the evidence, considered in the light most favorable to the respondent, the jury could have found, as it obviously did, that the collision was caused proximately and solely by the negligence of the appellant John B. Porter.

█ The third assignment of error relates to two instructions, Nos. 25 and 33, under which the jury was privileged to find from the evidence that Kellerher was acting in a situation of emergency when he turned the front wheels of his car to the left, across the center line of the highway. Appellants' contention upon this assignment is that there was no evidence to support a finding of emergency; that respondent was evidently intending to pass the Heath car, but was following that car too closely to be able to see oncoming traffic when he pulled out to pass, or else was inattentive to approaching traffic while he was in the act of passing, or attempting to pass, the Heath car; and that if an emergency then existed, it was caused by Kellerher's own negligence. In support of their contention, appellants cite the case of *Ritter v. Johnson,* 163 Wash. 153, 300 Pac. 518, 79 A. L. R. 1270.

In the cited case, there was evidence to the effect, and the court found, that the appellant therein had turned to his left to escape a hazard caused by his own negligence, and hence could not invoke the emergency rule. In the case at bar, there was, on the contrary, evidence from which the jury could find, and obviously did find, that the emergency was created not by any negligence of Kellerher, but solely because of the negligent acts of Dr. Porter. The trial court did not err in giving these instructions.

██ The next assignment of error relates to certain impeaching testimony, admitted by the court over appellants' objection. On cross-examination of appellants' witness Charles A. Heath, he was asked two questions as a foundation for his subsequent impeachment. By those questions, he was interrogated as to whether, at the scene of the accident, he had made certain statements to two police officers concerning his observation of the collision.

The witness' answer was: "I did not." The two officers were then called by respondent on rebuttal and, over appellants' objection, testified that Heath had made such statements to them at the hospital about a half-hour after the accident.

It is true, as asserted by appellants, that the impeaching testimony went beyond the strict terms of the preliminary foundation, permitting the impeaching witnesses to testify as to statements made by Heath at a time and place different from those specified in the cross-examination of the witness Heath. It is also true that it is the general rule in this state that, before impeaching evidence can be introduced concerning contradictory statements made out of court by a witness, the time when, the place where, and the circumstances under which the contradictory statements were made by the witness must be given and opportunity afforded the witness to deny, admit, or explain them. *State v. Constantine,* 48 Wash. 218, 93 Pac. 317; *State v. Schuman,* 89 Wash. 9, 153 Pac. 1084, Ann. Cas. 1918A, 633; *State v. Harmon,* 21 Wn. (2d) 581, 152 P. (2d) 314.

While we are of the opinion that, in view of all the surrounding facts and circumstances, the ruling of the trial court was not, in this instance, prejudicial to appellants, we nevertheless caution counsel that the grounds here laid for the impeachment of the witness were not in strict conformity with the rule in this state, which should be followed. See *State v. Walters,* 7 Wash. 246, 34 Pac. 938, 1098; *Nethery v. Nelson,* 51 Wash. 624, 99 Pac. 879.

 The next assignment of error is predicated upon the refusal of the court to grant a new trial on the ground of misconduct of respondent's counsel. With reference to this assignment, we may say at the outset that the record is replete with acts of misconduct committed by both counsel, and it would be most difficult to assert which of opposing counsel was the greater offender. Of this we are satisfied, however, that appellants' counsel was at least an equal offender in this respect. Time and again the trial court admonished counsel that their actions and remarks were

extremely improper, and the record indicates that at times the court's patience was tried almost to the point of exhaustion. One of the many admonitions given by the court was as follows:

"I've been pretty lenient. I've put up with a lot. You've wasted four hours with this constant quibbling between counsel and I'm tired. Proceed."

We regret to say that both counsel exposed themselves to the hazard of severe discipline by the court, and had the court meted out some form of punishment it not only would have been merited, but also might have had some curbing effect upon the offending parties.

In partial justification of respondent's counsel, so far as the present assignment is concerned, we may say that his remarks and statements, of which complaint is made, were to a great extent retaliatory, in that they were invited by language used and conduct displayed by opposing counsel. Under the circumstances presented to us by the record, we are unable to say that appellants were prejudiced by the remarks of respondent's counsel or that, because of them, appellants were prevented from having a fair trial. *O'Neil v. Crampton*, 18 Wn. (2d) 579, 140 P. (2d) 308.

 Under a similar assignment of error, appellants suggest that they are entitled to a new trial because of misconduct on the part of the trial court. At one point in the trial, while appellants' counsel was insistently endeavoring, over respondent's strenuous objections, to get certain photographs into the record as exhibits, the court stated:

"You are attempting to get these photographs in through subterfuge, here, which is not proper and the objection will be sustained."

Appellants' counsel took exception to the court's remark, stating:

"I think it is prejudicial and unjustified. I think I am entitled to have the insinuation created, corrected, and beg leave of the court to correct it. It is not a 'subterfuge,' "

whereupon the court said:

"Perhaps I should use another word. You're right. But

it is an attempt to get pictures in through methods not proper and you, Counsel, should know it is not proper."

A few minutes later the following occurred:

"THE COURT: I wish to state to the jury: When the court used the word, 'subterfuge,' no reflection was intended upon counsel. MR. KAHIN: Thank you."

The use of the word "subterfuge" was inapt, and the court not only acknowledged its mistake in the use of it, but also specifically advised the jury that it was not intended as any reflection upon counsel. In other words, the court did exactly what counsel asked it to do, and counsel seemed satisfied with the court's statement. We perceive no prejudice resulting to the appellants from the occurrence.

Appellants by another assignment of error of similar kind complain of misconduct on the part of the jury, entitling appellants to a new trial. In support of their motion for new trial on this ground, appellants filed affidavits of two jurors and the affidavit of one of the attorneys for the appellants. The affidavit of one of the jurors stated:

"There was quite a bit of talk about insurance during the discussion but I said I didn't think that had anything to do with the case."

The affidavit of the other juror stated:

"I mentioned something like 'the Porters must have been insured' and I felt myself that anyone in their position or business must have had considerable insurance. This was on the jury."

The attorney's affidavit stated that one juror had told him that insurance was discussed by the jury in a general way, but that he, the juror, had told the others it should have nothing to do with the case; the affidavit further stated that another juror had told him that, during the discussion by the jury, some one had mentioned insurance, "something to the effect that a man in business would be crazy not to have insurance."

The granting or denying of a motion for a new trial on the ground of alleged misconduct of the jury is a

matter within the discretion of the trial court; and unless it clearly appears on appeal that the court abused its discretion or that palpable error was committed, the ruling of the trial court on such motion will not be disturbed. *Mathisen v. Norton,* 187 Wash. 240, 60 P. (2d) 1; *Dibley v. Peters,* 200 Wash. 100, 93 P. (2d) 720.

Assuming that the "talk about insurance" during the deliberations of the jury was improper, we think that the affidavits themselves fairly show that such talk had no effect upon the jury in arriving at its verdict. We are therefore unable to say that the trial court abused its discretion in its ruling.

We come now to what we consider to be the crucial question in the case. Appellants contend that the verdict is so grossly excessive as to indicate clearly that it was the result of passion or prejudice on the part of the jury, and have assigned as error the refusal of the court to grant a new trial on that ground.

The statute upon which the contention is based is Rem. Rev. Stat. (Sup.), § 399 [P.P.C. § 78-3], which provides that the court may grant a new trial for certain causes, one of which is stated in subd. (5) as follows:

"Damages so excessive or inadequate as unmistakably to indicate that the verdict must have been the result of passion or prejudice."

Consideration of this question requires a statement of some further facts.

At the time of his death, Mr. Kellerher was thirty-four years of age, and had a life expectancy of 38.29 years according to one mortality table, and 35.42 years according to another such table. He left surviving him his widow, thirty-two years of age, who is the respondent herein, and three children, aged thirteen, eleven, and ten years. The Kellerher family came to Bremerton from Montana in 1942. Prior to that time, Mr. Kellerher had worked on a ranch in Montana, and earned about one hundred twenty-five or one hundred fifty dollars a month. Before leaving Montana, he had taken a month's schooling in sheet metal work and

upon his arrival in Bremerton became employed as a first-class sheet metal worker in the Bremerton navy yard. At the time of his death, he was similarly employed at the Keyport navy yard, where he worked on what is termed the graveyard shift. At the end of his shift, he would go home, eat his breakfast, and then report for work as a truck driver for a man who was engaged in the trucking business in Port Orchard. In this way, Kellerher worked approximately sixteen hours a day. He also worked on Saturdays and Sundays. According to a purported employer's "withholding receipt," his earnings as sheet metal worker during the year 1945 amounted to $3,711.98. His earnings as a truck driver during the same year amounted to $934.10. His total earnings for the year thus would amount to $4,646.08.

Mrs. Kellerher testified that her husband earned as much in 1943 and 1944 as he did in 1945. She further testified that he customarily used only fifteen or twenty dollars a month for his personal needs and devoted the rest of his earnings to the needs of his family.

Respondent called as a witness an actuary to testify concerning the present value of future earnings contingent on the survival of a person through the period of his life expectancy. On the basis of annual earnings of four thousand dollars, payable in equal monthly installments from the time of the accident here involved up to the time of Mr. Kellerher's attaining the age of sixty-five years, had he survived, and discounting such earnings at the rate of $2\frac{1}{2}\%$ per annum, the witness testified that the present value thereof would amount to $79,571.96, $79,449.64, or $78,046.24, dependent upon the table used.

As previously stated, the jury returned a verdict in the sum of seventy thousand dollars. This amount was segregated by the jury as follows: to the respondent, surviving widow, forty thousand dollars, and to the children, thirty thousand dollars. On the basis of a life expectancy of forty years for the widow, being her minimum life expectancy as testified by the actuary from standard tables,

this would mean that she was allocated the sum of one thousand dollars a year for life. The number of years between the ages of the children at the time of their father's death and the date of their majority would be eight, nine, and eleven, respectively, or a total of twenty-eight years. On that basis, they would each be allocated the sum of $1,071.43 annually during their minority, or a total of $3,214.29 for the three children during the period of minority of the oldest child. The total annual allocations to the widow and the three children during the first nine years elapsing after Mr. Kellerher's death would thus amount to $4,214.29. If Kellerher had survived and during that period had allocated that much of his salary to his wife and children, it would have left him but $431.79 a year for his own needs and support.

We recognize the rule that the determination of the amount of damages in an action is primarily the province of the jury, under proper instructions by the trial court, and that courts are reluctant to interfere with the conclusion of the jury, when fairly made, in such matters. *Walker v. McNeill*, 17 Wash. 582, 50 Pac. 518; 15 Am. Jur. 620, Damages, § 204; 25 C. J. S. 910, Damages, § 196.

We are also keenly cognizant of the fact that the purchasing power of money is less today than it was ten, fifteen, or twenty years ago. This court has given utterance to that thought many times. *McCreedy v. Fournier*, 113 Wash. 351, 194 Pac. 398; *Allison v. Bartelt*, 121 Wash. 418, 209 Pac. 863; *Brammer v. Percival*, 133 Wash. 126, 233 Pac. 311; *McQuary v. Penketh*, 194 Wash. 57, 76 P. (2d) 1024.

However, after careful consideration of all the facts and circumstances of this case, we are constrained to hold that the amount of the verdict is so excessive as plainly to indicate that it must have been the result of passion or prejudice on the part of the jury. Until coming to the state of Washington in 1942, Mr. Kellerher had never earned to exceed one hundred twenty-five or one hundred fifty dollars a month, or, at most, eighteen hundred dollars

a year. The earnings upon which the verdict was based consisted of wages received during the war years when labor was in great demand and wages were abnormally high. To earn the wages which he received, it was necessary for Mr. Kellerher to work seven days a week, holding two jobs and, for at least six days a week, working sixteen hours a day. The verdict is based upon a combination of problematical facts: (1) that the deceased would have lived to the age of sixty-five years; (2) that he would have been physically able to work during that entire period; (3) that he could have obtained employment during all that time; (4) that he either could have held two jobs, working seven days a week, sixteen hours a day, or else have procured a single job which would have paid him as much as the two; and (5) that the wages which he would have received throughout the entire period would have been as high as the wages which he was receiving at the time of his death.

We think it unreasonable to suppose or presume that Mr. Kellerher would have maintained an earning ability to that extent for that period of time, or that he could have earned monthly wages which, when reduced to their present value, would be worth seventy thousand dollars. In our opinion, the amount of the verdict exceeds any rational appraisal or estimate of the damages sustained by the parties in whose behalf this action was brought. Some of the cases in which this court has disapproved the verdict of the jury because of its excessiveness are the following: *Vowell v. Issaquah Coal Co.,* 31 Wash. 103, 71 Pac. 725; *Stone v. Seattle,* 33 Wash. 644, 74 Pac. 808; *Rangenier v. Seattle Electric Co.,* 52 Wash. 401, 100 Pac. 842; *Mosso v. Stanton Co.,* 85 Wash. 499, 148 Pac. 594, L. R. A. 1915F, 148, 447; *Thompson v. Fiorito,* 167 Wash. 495, 9 P. (2d) 789, 12 P. (2d) 1119.

Since, in our opinion, the verdict is so excessive and unreasonable as to be unaccountable except upon the theory that the jury was influenced by passion or prejudice, we think a new trial should be granted, rather than that

respondent be given the option of accepting judgment in some lesser amount. *Phillips v. Thomas*, 70 Wash. 533, 127 Pac. 97, 42 L. R. A. (N.S.) 582, Ann. Cas. 1914B, 800, 69 A. L. R. 1291; *DePhillips v. Neslin*, 155 Wash. 147, 283 Pac. 691; *Puget Sound Lbr. Co. v. Mechanics' & Traders Ins. Co.*, 168 Wash. 46, 10 P. (2d) 568.

This disposition of the case requires that we consider several other assignments of error, inasmuch as the same matters may present themselves on a new trial.

One of these assignments is that the court erred in limiting cross-examination of one of respondent's witnesses regarding certain photographs produced by appellants.

A state patrolman, produced as a witness for respondent, testified that he was called to the scene of the accident shortly after its occurrence and that, while there, he observed certain marks upon the pavement, examined the debris on the highway, and took certain measurements. For the purpose of testing the witness' memory, credibility, and powers of perception, appellants' counsel, on cross-examination, endeavored to interrogate him with reference to certain photographs which counsel at that time produced from his files, but which had not been introduced or offered in evidence by respondent. With that objective in view, counsel sought first to have the witness identify the photographs. The court refused to permit any interrogation of the witness regarding the pictures until and unless they were first identified by the photographer who took them.

Whether a photograph is sufficiently identified as a proper representation is a preliminary question to be determined by the trial judge, and his determination thereof will be reviewed only for abuse of discretion. *Quayle v. Knox*, 175 Wash. 182, 27 P. (2d) 115; *Keseleff v. Sunset Highway Motor Freight Co.*, 187 Wash. 642, 60 P. (2d) 720.

However, it is also the rule that proof of the accuracy of a photograph may be given by anyone who has knowledge of the thing represented thereby. *Knapp v. Siegley*, 120 Wash. 478, 208 Pac. 13; 32 C. J. S. 624, Evidence, § 715.

Appellants had the right to have the witness identify, if he could, the photographs as true and correct representations of what they purported to be, and, upon identification by him, to interrogate him further thereon, provided the photographs were relevant and material to matters elicited upon direct examination and did not tend to confuse the jury. If the witness could not thus identify them, further cross-examination with reference thereto would not be permissible. Scott, Photographic Evidence, 769, § 835; *Martin v. State,* 100 Fla. (Part one) 16, 129 So. 112; *Williams v. Alabama Great Southern R. Co.,* 15 Ga. App. 652, 84 S. E. 149. The court should have allowed appellants' counsel to proceed with the interrogation in his effort to have the witness identify the photographs; further interrogation would then depend on the success or failure of such identification.

Another of appellants' assignments is that the court erred in admitting in evidence the two wage-withholding receipts referred to above. One of these receipts was purportedly prepared by the United States government, as Kellerher's employer at the Bremerton navy yard, and showed earnings of $3,711.98 during the year 1945. The other receipt was purportedly prepared by Ralph I. Connell, for whom Kellerher drove a truck, and showed earnings of $934.10 during that same year. It was upon the basis of these combined amounts of earnings that the actuary-witness subsequently calculated the present worth of Kellerher's earnings up to the age of sixty-five years, had he survived.

The two receipts, which were carbon copies of purported originals, were introduced in evidence in the following manner: While Mrs. Kellerher was on the witness stand, the receipts were shown to her. She did not state what they were or by whom they had been prepared; she merely stated that "they represented the amount Mr. Kellerher made for the year 1945." Later, during the trial, after the receipts had been admitted in evidence, Mr. Connell testified that one of them, in the amount of $934.10, was the one he had "sent in." However, at the time the receipts were

admitted in evidence, no showing was made as to their accuracy or as to the persons who prepared them; or that they were *the* withholding receipts prepared by the respective employers; or that the carbon copies were duplicates of the original receipts.

Appellants objected to the introduction of the two withholding receipts on the ground that they were hearsay and not competent evidence. The trial court overruled the objection and admitted the receipts, apparently on the ground that they were official records required by the government, and therefore admissible even though they had not been identified by the custodian of the records, nor had been certified or authenticated. The court took judicial notice of the laws requiring employers to prepare and file withholding receipts recording the earnings of their employees.

As stated in 20 Am. Jur. 832, Evidence, § 985, documents of a public nature are generally admissible in evidence, although their authenticity is not confirmed by the usual and ordinary tests of truth, and the power of cross-examination of the parties on whose authority the truth of the document depends is lacking. See, also, 32 C. J. S. 478, Evidence, § 626.

This exception to the hearsay rule has been recognized in this state. *State v. Bolen,* 142 Wash. 653, 254 Pac. 445; *Grant v. Fisher Flouring Mills Co.,* 190 Wash. 356, 68 P. (2d) 210; *Steel v. Johnson,* 9 Wn. (2d) 347, 115 P. (2d) 145.

Books of account, or so-called "shop records," have likewise been held admissible as an exception to the hearsay rule, under similar reasoning. *Cascade Lbr. Co. v. Aetna Indemnity Co.,* 56 Wash. 503, 106 Pac. 158; *Bohlke v. Wright,* 200 Wash. 374, 93 P. (2d) 321; 5 Wigmore on Evidence (3d ed.), § 1521 *et seq.*

Although such writings, when relevant, are admissible as exceptions to the hearsay rule, the authorities are nevertheless in agreement that it is necessary first to show what the writings are, and that they are genuinely what they purport to be. Until this is shown, they do not

come within the exception to the hearsay rule and are therefore inadmissible. As stated in 5 Wigmore on Evidence (3d ed.) 535, § 1637(2),

"The rule of Authentication (*post*, § 2129) evidencing the *genuineness of a particular document* has always to be satisfied; for an official document may belong to a class clearly admissible under the present exception, and still the document actually offered must be authenticated as genuinely that which it purports to be."

Again, it is stated in 7 Wigmore on Evidence (3d ed.) 570, § 2130:

"The general principle has been enforced that a writing purporting to be of a certain authorship cannot go to the jury as possibly genuine, merely on the strength of this purport; *there must be some evidence of the genuineness* (or execution) of it."

In 20 Am. Jur. 920, Evidence, § 1069, the rule with reference to books of account is stated in the following language:

"It is well recognized that the mere production of books of account without identification is not sufficient to entitle them to admission. They must be accompanied by the oath of the party who made the entries or by the oath of some person who knew the entries to be correct."

See, also, 32 C. J. S. 575, Evidence, § 693.

An examination of the cases in this jurisdiction wherein public documents or records and shop records were admitted in evidence discloses that the writings were either certified or introduced by the custodian thereof, and that the requirements as set forth above were in fact satisfied. *Cherry Point Fish Co. v. Nelson,* 25 Wash. 558, 66 Pac. 55; *Anderson v. Hilker,* 38 Wash. 632, 80 Pac. 848; *Peterson v. Arland,* 79 Wash. 679, 141 Pac. 63; *Clements v. Cook,* 112 Wash. 217, 191 Pac. 874; *State v. Bolen, supra; Grant v. Fisher Flouring Mills Co., supra.*

The amount of proof required to identify and show the admissibility of a shop record is generally greater than that required to introduce and admit into evidence a public document or record, since by its nature the latter imports greater veracity than the former.

▆ In the instant case, it is unnecessary to determine whether the withholding receipts are public records or whether, having been issued in a proprietary capacity by the government as well as by Connell, they are to be considered as shop records. In either case, they were not identified or shown to be genuinely that which they purported to be, and were therefore inadmissible.

▆ Appellants assign as error the giving of instruction No. 29, which read:

"Where the negligence of the person sought to be held is the proximate cause, and that of the other party is a remote cause of the injury, a recovery may be had, although the other party was not entirely free from fault. Where the acts or omissions of the other party amount merely to the antecedent occasion or condition of the injury, remote in the sense of causation, it is not contributory negligence."

The instruction may have been technically correct as to form, and expressive of the law as declared by this court in *Redford v. Spokane Street R. Co.*, 15 Wash. 419, 46 Pac. 650; *Short v. Spokane*, 41 Wash. 257, 83 Pac. 183; *Richardson & Holland v. Owen*, 148 Wash. 583, 269 Pac. 838; *McAbee v. French*, 150 Wash. 646, 274 Pac. 713. However, in our opinion, it was not applicable to any issue in the case.

Appellants offered evidence of negligence on the part of the deceased in two respects: (1) in operating his automobile at the time of the accident while in a drunken condition; and (2) in driving onto the wrong side of the highway, at an excessive rate of speed, without giving any attention to approaching traffic. These were the only acts of negligence with which he was charged by the appellants.

If the deceased were guilty of negligence in either of these respects, it would be not a remote, but a proximate, contributing cause of the accident. The vice of the instruction is that it enabled the jury to say that the deceased was guilty of one or both of these specified acts, but at the same time permitted it to find that such acts were but remote causes or conditions. The giving of the instruction was error.

Appellants next assign error upon an instruction in which the jury was told that if it should decide that respondent was entitled to recover, then, in determining the amount to be awarded for the benefit of the wife and minor children, it could consider the aggregate amount of contributions which the widow and children would have received from the deceased, had he lived, and the present value of such aggregate sum, as shown by the evidence, and that any award for such loss of support should be on the basis of the present value of such aggregate sum.

The only evidence in the case with respect to present value of future earnings was that adduced by the respondent through the actuary-witness, who testified that the discount rate used in the computation of the annuity tables was two and one-half per cent.

Appellants excepted to the court's instruction on the ground, and now contend, that the proper rate of interest to be used as the discount rate is the *legal rate* of interest in this state, which is six per cent. ·

Two questions are raised, or rather suggested, by this assignment of error: (1) whether the jury should be instructed as to the reduction of future earnings to present value; and (2), if so, what rate of discount should be considered.

No case from this jurisdiction on either of these questions has been cited to us by counsel, and none has otherwise come to our attention.

On the first of these questions, it is the generally recognized rule in the United States that the trial court must, or with propriety may, in an action for wrongful death, instruct the jury to limit the amount of recovery in respect of the loss of future pecuniary benefit to its present worth or cash value. The cases on the subject will be found assembled in an annotation appearing in 77 A. L. R. 1439, 1441; for recent cases, see citations in A. L. R. Blue Books of Supplemental Decisions; see, also, Notes (1945), 154 A. L. R. 796 and supplemental decisions.

While discounting future earnings to present value may

at times pose a difficult problem for a jury and, at best, may be only an approximation of damages in that respect, it is nevertheless, in our opinion, a factor which the jury may consider, in connection with all the other facts and circumstances in the case, in determining the amount of damages for loss of future earnings; and, where there is substantial evidence of loss of such earnings, the court may with propriety instruct, and upon proper request should instruct, the jury to limit the amount of recovery for loss of such earnings to their present worth or cash value.

As is evident from a study of discounting, the present value of future earnings is totally dependent, as a mathematical computation, upon the rate of discount that is used. The higher the rate of discount that is adopted, the lower will be the present value of any aggregate amount of future earnings. If, in the case at bar, the jury had used a discount rate of six per cent, the present value of earnings of four thousand dollars per annum of a man aged thirty-four years and living to the age of sixty-five years would amount to approximately fifty-six thousand dollars, while, as previously stated, the use of a discount rate of two and one-half per cent would increase the present value of such future earnings to approximately seventy-eight thousand dollars.

It is therefore necessary, in such situations, that the jury be given some rate of discount or have some guide for its determination, through the court's instructions.

As stated in an annotation in 105 A. L. R., beginning at p. 234, wherein the cases are collected and analyzed, the courts apparently have not had occasion to consider to any great extent the rate of discount to be used in computing the present value of future earnings or benefits lost on account of death or personal injury. Some courts, and probably the majority of them, have adopted as the discount rate the "legal rate" of interest within the particular jurisdiction; others have proceeded on the theory of allowing the highest net rate as shown by the evidence; and still others have gone upon the principle that the matter should

be left to the jury to adopt such rate as it found to be reasonable, just, and right, under all the circumstances.

In cases arising out of the Federal employers' liability act, the generally accepted rule is that the rate of discount should be based on the rate of interest available on safe investments. The leading case on this point, under that act, is *Chesapeake & Ohio R. Co. v. Kelly,* 241 U. S. 485, 60 L. Ed. 1117, 36 S. Ct. 630, L. R. A. 1917F, 367, 13 N. C. C. A. 673, wherein it was held that the trial court should have instructed the jury that damages for the deprivation of future benefits were to be based on the present cash value of such benefits. We quote from the opinion in that case:

"We do not mean to say that the discount should be at what is commonly called the 'legal rate' of interest; that is, the rate limited by law, beyond which interest is prohibited. It may be that such rates are not obtainable upon investments on safe securities, at least without the exercise of financial experience and skill in the administration of the fund; and it is evident that the compensation should be awarded upon a basis that does not call upon the beneficiaries to exercise such skill, for where this is necessarily employed the interest return is in part earned by the investor rather than by the investment. This, however, is a matter that ordinarily may be adjusted by scaling the rate of interest to be adopted in computing the present value of the future benefits; it being a matter of common knowledge that, as a rule, the best and safest investments, and those which require the least care, yield only a moderate return."

See, also, *Gulf, C. & S. F. R. Co. v. Moser,* 275 U. S. 133, 72 L. Ed. 200, 48 S. Ct. 49; *Western & A. R. R. v. Hughes,* 278 U. S. 496, 73 L. Ed. 473, 49 S. Ct. 231; *Southern Pac. Co. v. Klinge,* 65 F. (2d) 85 (writ of certiorari denied in 290 U. S. 657, 78 L. Ed. 569, 54 S. Ct. 72).

We believe that the Federal rule referred to above is a sound and just one and should be applied to the instant case and cases of a similar nature, even though such a holding may not be in strict accord with the majority of the decisions on the subject.

In our opinion, the trial court, when requested, should, by its instruction, inform the jury of the method to be used in determining the present value or worth of future earnings; and should further advise the jury that it should use as the discount rate that rate of interest which, in its considered judgment, is reasonable, just, and right under all the circumstances, taking into consideration the evidence presented, the jury's knowledge of the prevailing interest rates within the limits prescribed by law in that area, and what rate of interest could fairly be expected from safe investments which a person of ordinary prudence, but without particular financial experience or skill, could make in that locality.

While the instruction given by the court in this instance did not set forth all of the elements above suggested, it cannot be held to be erroneous, since the jury was not compelled to adopt a discount rate of six per cent in computing the present worth of future earnings, nor was the instruction palpably inconsistent with the suggestions set forth above.

The last assignment of error presented in appellants' opening brief is based upon the refusal of the court to grant a new trial. This assignment is general in its nature, and is not separately discussed. It is fully covered by what has already been stated herein and requires no further consideration.

After judgment was entered, appellant Elmer R. Porter evidently employed additional counsel, who signed the notice of appeal on his behalf and thereafter, upon leave granted, filed in this court a brief as "amici curiae," contending therein that judgment should not have been entered against him individually or personally.

The complaint alleged that appellants John B. Porter and Elmer R. Porter at all times here involved were partners doing business under the firm name of Porter Clinic. The amended answer, filed on behalf of all the appellants, including Elmer R. Porter, did not deny that allegation. Appellant John B. Porter testified that, at the time of the acci-

dent, he was en route from the clinic to the hospital in Bremerton to see a patient, thereby establishing that he was on partnership business. Appellant Elmer R. Porter was present during the trial and was at that time represented by the same counsel who represented the other parties defendant. He did not in any way contradict the testimony of his codefendant. See *Sidis v. Rosaia,* 170 Wash. 587, 17 P. (2d) 37.

In 1945, prior to the occurrence here in question, the legislature of this state enacted the uniform law of partnership (Laws of 1945, chapter 137, p. 349 [Rem. Supp. 1945, § 9975-40 *et seq.*]). Under that act, all partners are jointly and severally liable to third parties for everything chargeable to the partnership by reason of the wrongful act of any partner acting in the ordinary course of business of the partnership or with the authority of his copartners. Rem. Supp. 1945, §§ 9975-52, 9975-54.

We think the contention of appellant Elmer R. Porter is without merit.

For the errors committed, as hereinabove indicated, the judgment is reversed, and the cause remanded for a new trial.

MALLERY, C. J., BEALS, ROBINSON, and JEFFERS, JJ., concur.

---

February 18, 1948. Petition for rehearing denied.