[No. 32176.   Department One.   February 20, 1953.]

NORMA THOMPSON, *as Administratrix, Respondent,* v. THE CITY OF SEATTLE, *Appellant.*[1]

[1]Reported in 253 P. (2d) 625.

*A. C. Van Soelen* and *Arthur Schramm*, for appellant.

*Barker & Day* and *William J. Walsh, Jr.*, for respondent.

SCHWELLENBACH, J.—This is an appeal from a judgment entered upon the verdict in a wrongful death action arising out of a collision between a city transit bus and a motorcycle operated by the decedent.

Genesee street in Seattle runs in an easterly and westerly direction and is forty-two feet wide from curb to curb. It is intersected by Thirty-sixth avenue south, which is twenty-five feet wide from curb to curb, and which runs practically in a northerly and southerly direction. Rainier avenue is one block west of and parallel to Thirty-sixth avenue south. There is quite a wide curve on Rainier avenue, in both a

northerly and southerly direction, where Genesee street meets it.

June 7, 1950, John C. McKenzie, a city transit operator, was operating the Seward Park shuttle from the intersection of Rainier and Genesee to Seward Park avenue and return. At 6:40 p. m. he was returning, traveling west on Genesee. The bus was empty. His intention was to turn left and south on Thirty-sixth avenue south for a distance of one block, then west one block to Rainier, one block north on Rainier and then east on Genesee.

He testified that, as he approached Thirty-sixth, he noticed one car traveling east on Genesee. It was near the alley, which is located 140 feet west of Thirty-sixth and about midway° between Rainier and Thirty-sixth. He noticed no other vehicles in front of him on Genesee. He stopped at Thirty-sixth to permit the eastbound car to proceed and then started to turn left. As he was turning, and while partially on the left side of Genesee, a collision occurred between the bus and the motorcycle being driven in an easterly direction by Robert Thompson. Thompson was thrown twenty-nine feet six inches in a southerly and slightly easterly direction. He was instantly killed. The motorcycle traveled forty-two feet eight inches in an easterly and partially southerly direction.

The point of impact was determined from the debris, which was strewn in a southerly direction. The debris started at a point nine feet seven inches from the south curb of Genesee and seven feet west of the east curb line of Thirty-sixth. The bus traveled a short distance after the impact. The left front of the bus showed marks of the collision, as did the left side of the motorcycle, although the front wheel of the motorcycle was unmarked.

The widow sued the city for damages to herself and her four children. The jury awarded her the sum of $18,791.75; and awarded James, age 8, $4,180.00; Thomas, age 6, $4,687.00; Loren, age four and one-half months, $5,728.00; and Diana, who was born after the father's death, $5,805.00; or a total of $39,191.75.

The bus driver was not present at the trial, and his deposition was read. He testified that he had to be more careful while making that turn, in watching out for traffic on Thirty-sixth, because the bus occupied most of the intersection. We quote his testimony with reference to the motorcycle:

"Q. Did you see the motorcycle approaching then? A. I heard it and saw it just about the same time, just a split second in between. Q. And what did you do? A. Came to a complete stop. Q. Did you see the motorcycle approaching? A. After I heard it, yes. Q. Did you observe the motorcycle rider at any time between then and the point of collision? A. Oh, just a couple of seconds at the most. Q. Could you see in what direction he was looking? A. Well, just the quick glimpse that I did get of him, he seemed to have his head down. Q. What portion of his head could you see? A. Well, the top of his head."

The witness marked two drawings on exhibit 15, a map of the premises: B-1, where the bus stopped at the intersection; and B-2, where the bus stopped at the time of the collision. He testified:

"Q. Where was the motorcycle when you heard it and saw it? A. Just on the east side of the alley. [Note: Alley 140 feet west of Thirty-sixth.] . . . Now where were you at the time you saw it? At B-2? A. Yes. Q. Let's mark this M-1. [Location of motorcycle just east of the alley.] A. The bus hadn't moved more than a quarter of a length of the bus from the time I saw the motorcycle up until the time I stopped. Q. A quarter of the length of the bus would be a matter of six or seven feet? A. Yes. Q. By the time you reached this point do you know where the motorcycle was then? A. No, I don't know. It wasn't, I wouldn't say, more than three seconds from the time I saw him until the time of the collision. Q. And where was your bus at the time of the collision? A. At B-2. Q. That is where you stopped? A. Yes."

He also testified:

"Q. Did you have an opportunity to observe the speed of the motorcycle before the accident? A. Just a quick estimate was all. Q. Did you form an opinion as to his speed? A. I did; about between 40 and 45. Q. Between 40 and 45. Did the motorcycle change its course? A. No, sir. Q. How much room was there between the left front corner of your

bus and the south curb line or paved margin of Genesee Street? A. Oh, between 12 and 15 feet. Q. Was there any obstruction in that space between you and the motorcycle rider? A. No, sir."

However, Officer Masar testified that he was two blocks away and immediately went to the scene of the accident; that the bus driver told him he did not see the motorcycle until the time of the impact. He testified that the bus driver was upset, but that he became more upset later. Mrs. Reta Devlin testified that she heard the bus driver tell Officer Masar that he was coming along Genesee street, and started to make his left hand turn. He said, "I looked up, and there he was." She did not hear him say anything about an automobile proceeding ahead of the motorcycle. She heard all of the conversation with Officer Masar. Under cross-examination, McKenzie testified that he didn't remember telling the officer that he didn't see the deceased until the collision, but that he may have.

Jack Herrington testified that, immediately before the accident, he came out of the Genesee Tavern, which is west of the alley between Rainier and Thirty-sixth; that he walked west to a stop sign on the curve of Rainier avenue; that he heard the motorcycle coming down Rainier and watched it intermittently until it got to the alley; that in a little while he heard the collision. He could not tell how much time elapsed from the moment he last saw the motorcycle at the alley until the collision. He estimated the speed of the motorcycle at between fifty and fifty-five miles an hour when it was coming around the curve from Rainier to Genesee. He testified under cross-examination that, after first seeing the motorcycle coming down Rainier, he walked leisurely back to the tavern door, glancing backward from time to time; that that was a distance of thirty feet; that by the time he got back to the tavern door the motorcycle was at the alley. He had never driven a motorcycle, but had driven cars. He testified that the motorcycle was in the center lane when he saw it.

George E. DeFoe testified that he was waiting on the south side of Genesee, a short distance west of the alley,

for the shuttle bus involved in this action; that, when the motorcycle came around the curve from Rainier to Genesee, it swung out, and the driver was leaning at a twenty to thirty degree angle, with his head down. He would not estimate the speed. He said that he didn't like motorcycles or automobiles, but would judge that it was going fast. He testified: "These fellows coming on a motorcycle, they may be coming around ten, twenty or thirty."

Appellant makes the following assignments of error. The trial court erred:

1. In denying defendant's challenge to the sufficiency of the evidence.

2. In denying motion for judgment notwithstanding the verdict.

3. In denying motion to strike the actuary's testimony of gross earnings.

4. In giving instruction No. 4.

5. In giving instruction No. 6.

6. In refusing to give requested instruction on duty of favored driver.

7. In refusing to give requested instruction that ordinance violation is negligence as a matter of law.

8. In denying motion for new trial.

9. In entering judgment upon the verdicts.

■ The challenge to the sufficiency of the evidence at the close of plaintiff's case was denied, and upon denial the city put in its evidence. Assignment of error No. 1 is therefore without merit.

■■ In *White v. Burke*, 31 Wn. (2d) 573, 197 P. (2d) 1008, we quoted the rule laid down in *Simmons v. Cowlitz County*, 12 Wn. (2d) 84, 120 P. (2d) 479:

" 'We have uniformly held that a motion for judgment notwithstanding the verdict should not be granted unless the court can say, as a matter of law, that there is neither evidence nor reasonable inference from the evidence to justify the verdict.

" 'All competent evidence in the record which is favorable to the appellants we must regard as true and must give to them the benefit of every favorable inference which may reasonably be drawn from such evidence. Where the minds

of reasonable men may differ, the question should be submitted to the jury. If, when so considered, we find there is substantial evidence to sustain the verdict, the judgment thereon must be affirmed.' "

■ The jury would have been justified, because of the testimony of Officer Masar and Mrs. Devlin, and the admission of the bus driver, in not believing the testimony of McKenzie as to the speed of the motorcycle. Herrington estimated the speed at between fifty and fifty-five miles an hour. DeFoe judged that it was going fast, and then said: "These fellows coming on a motorcycle, they may be coming around ten, twenty or thirty." Clearly the estimates of these two witnesses were conjectural. The minds of reasonable men could differ as to the speed of the motorcycle. We cannot say as a matter of law that there was neither evidence nor reasonable inference from the evidence to justify the verdict.

■ Another argument in support of assignment of error No. 2 is that the deceased was guilty of contributory negligence in that he could have avoided the accident because there was sufficient room for him to swerve to his right, between the bus and the curb, and thus have missed the bus entirely. Having in mind the rule heretofore enunciated with respect to consideration of motions notwithstanding the verdict, the jury could have found, from the evidence, that the deceased was in the center lane when he passed the alley and that the point of impact was nine feet seven inches from the south curb of Genesee, which was forty-two feet wide. Furthermore, only the left side of the motorcycle was damaged and the front wheel was undamaged. The jury could have concluded from this evidence that deceased, confronted with an emergency, was swerving to his right in an attempt to avoid the collision.

During the trial, the court allowed an actuary to testify as to the amount of gross future earnings which the deceased would have contributed to the support of his family, based upon an actuarial table of life expectancy. The table from which the actuary testified was introduced into evidence without objection. Appellant made timely motion to strike

the testimony of the actuary upon the ground that the only admissible evidence was as to the present worth of the gross future earnings. This motion was denied by the trial court, and appellant assigns the court's denial of the motion to strike as error on this appeal.

In support of this contention, appellant cites the case of *Kellerher v. Porter*, 29 Wn. (2d) 650, 189 P. (2d) 223, in which case the court said:

"While discounting future earnings to present value may at times pose a difficult problem for a jury and, at best, may be only an approximation of damages in that respect, it is nevertheless, in our opinion, a factor which the jury may consider, in connection with all the other facts and circumstances in the case, in determining the amount of damages for loss of future earnings; and, where there is substantial evidence of loss of such earnings, the court may with propriety instruct, and upon proper request should instruct, the jury to limit the amount of recovery for loss of such earnings to their present worth or cash value."

It should be noted that the appellant in the present case made no request for an instruction to the jury in respect to limiting the recovery for future earnings to their present worth.

As we view the decision of this court in the case of *Kellerher v. Porter, supra,* it does not support appellant's contention. We have made an exhaustive search of the authorities and can find no case precisely in point on the question here presented by appellant. The general rule in the majority of the jurisdictions of the United States is as set forth in the quoted portion of the *Kellerher* case, above. From the words of the court in that decision, it is implicit that the ultimate burden of deciding what amount of money will correspond to the present worth of future earnings, so as to adequately and fairly compensate the plaintiff for his loss, is upon the jury, and the jury alone. Thus, though the testimony of an actuary as to the present value of future earnings might be of great help to the jury in arriving at a verdict, the jury is not bound by the testimony of such expert witness. From this it can be seen that the introduction of testimony as to the gross earnings by the actuary

was in no sense error, though perhaps cumulative of the evidence of the actuarial tables themselves, from which the jury by a simple multiplication could have arrived at the same result as did the expert witness.

The legislature of this state has seen fit to leave the finding of damages, in case of wrongful death, to the jury.

"In every such action the jury may give such damages as, under all circumstances of the case, may to it seem just." RCW 4.20.020 [cf. Rem. Rev. Stat., § 183-1.]

■ As we view the evidence, the testimony of the actuary as to the gross future earnings of the deceased, based upon an actuarial table properly admitted into evidence, was one of the circumstances which the jury might properly consider in arriving at a verdict. Appellant's motion to strike the testimony was properly denied.

■ Instruction No. 4 stated that a motorcycle is a lawful means of conveyance, and that its operator is entitled to the same rights and is subject to the same liabilities as the operator of any other vehicle. It is urged that, in giving this instruction, the trial court singled out one of the two vehicles for special attention, thereby sanctifying the motorcycle. In considering all of the instructions together, we do not find that instruction No. 4 magnified the importance of the motorcycle. Nor do we see how the jury could have gained that impression. Furthermore, we feel that the instruction was necessary and proper because laymen are apt to have the feeling that a motorcycle does not have the same status on the highways as an automobile.

Instruction No. 6 was as follows:

"Under the undisputed evidence the transit bus was making a left turn in the intersection. On so doing, the duty devolves upon the bus operator to yield the right-of-way to a driver, such as the decedent, approaching the intersection on the bus driver's right, and to yield to the driver approaching from the right the entire half of the street (in this case the south side of Genesee street) along which the latter has the right-of-way.

"In this connection you are instructed that rights-of-way herein referred to are relative. There is always present the duty on behalf of all drivers to use reasonable care. Each

must intelligently exercise his faculties to the end that all that is physically present to be seen, in the exercise of reasonable care, shall be seen and observed by the respective drivers. The law does not permit one to say that he looked and did not see that which was physically present to be seen and which would have been seen by such person if he had actually and intelligently looked and exercised his faculties.

"The failure to obey and follow these rules of the road constitutes negligence on the part of the driver who so violates the law."

Complaint is made that subdivision (4) of the rule laid down in *Martin v. Hadenfeldt,* 157 Wash. 563, 289 Pac. 533, was not given. The four rules are:

"(1) All rights of way are relative, and the duty to avoid accidents or collisions at street intersections rests upon both drivers.

"(2) The primary duty of avoiding such accidents rests upon the driver on the left, which duty he must perform with reasonable regard to the maintenance of a fair margin of safety at all times.

"(3) If two cars collide within the intersection, then they were simultaneously approaching a given point within the intersection, within the meaning of the statute, unless—

"(4) The driver on the left assumes and meets the burden of producing evidence which will carry to the jury the question of fact as to whether or no the favored driver on the right so wrongfully, negligently, or unlawfully operated his car as would deceive a reasonably prudent driver on the left and warrant him in going forward upon the assumption that he had the right to proceed."

Rule (4), as to deceit, was based upon the premise that the driver on the left, as he is about to enter the intersection, sees a car approaching on his right at such a distance that, if driven within the lawful rate of speed, it cannot reach the intersection until he has safely passed. That was not the situation here. The bus driver did not see the motorcycle until not more than three seconds before the collision. Furthermore, a driver of a cumbersome bus making a left turn into a narrow street must use more care than the driver of an automobile going straight ahead and crossing an intersection.

█ In addition, no instruction on the *Hadenfeldt* rule was proposed. The court was not required to amend an otherwise correct instruction, in the absence of a request by appellant. An exception does not take the place of a request. *Brammer v. Lappenbusch,* 176 Wash. 625, 30 P. (2d) 947; *Harris v. Holroyd,* 33 Wn. (2d) 915, 207 P. (2d) 765.

We shall discuss assignments of error Nos. 6 and 7 together. The following instructions were proposed by appellant and rejected:

*Proposed instruction referred to in assignment of error No. 6.* "The favored driver cannot proceed blindly into an intersection ignoring a vehicle which may be in the intersection but such favored driver is required to use ordinary care to avoid a collision either by stopping his vehicle if he can do so by the exercise of reasonable care or by swerving his vehicle to one side or the other if he has reasonable time and opportunity to do so. The favored driver cannot take the right of way when he sees or in the exercise of reasonable care should see that to do so will inevitably result in collision if he has time and opportunity to avoid the collision."

*Proposed instruction referred to in assignment of error No. 7.* "You are instructed that Section 50 of the Traffic Ordinance as amended by Ordinance No. 77425 reads in part as follows:

" '(a) Every person operating or driving a vehicle of any character shall operate the same in a careful and prudent manner and at a rate of speed no greater than is reasonable and proper under the conditions existing at the point of operation, taking into account the amount and character of traffic, weight of vehicle, grade and width of highway, condition of surface and freedom of obstruction to view ahead and consistent with any and all conditions existing at the point of operation so as not to unduly or unreasonably endanger the life, limb, property or other rights of any person entitled to the use of such highways.

" '(b) Subject to the provisions of subdivision (a) of this section, and except in those instances where a lower maximum lawful speed is provided by this code, or otherwise, it shall be unlawful for the operator of any vehicle to operate the same within the limits of this city at a speed in excess of the following: * * *

" '2. Thirty (30) miles per hour on arterial highways and stop streets when signposted as required by law, and except as otherwise provided herein.'

"You are instructed that violation of the foregoing ordinance is negligence as a matter of law. If you find from a fair preponderance of the evidence that the deceased violated the foregoing ordinance provisions and that such violation was one of the proximate causes of his injury and death then you are instructed that plaintiff cannot recover in this action and your verdict should be for the defendant the City of Seattle."

As to the first proposed instruction, the following took place, after the jury had retired and while counsel for appellant was excepting to certain instructions and to the court's failure to give certain requested instructions.

"THE COURT: I think it is substantially covered by one other instruction.

"MR. SCHRAMM: It could be.

"THE COURT: And it is argumentative and full of zeal and I did not give it for that reason. It has been proferred a number of times. ·

"MR. SCHRAMM: I like that kind of an instruction.

"THE COURT: It is quite difficult to avoid argument in any set of instructions unless one has about two days in which to turn out a set of instructions."

As to the second proposed instruction:

"MR. SCHRAMM: We except to the failure of the Court to give our requested instruction to the effect that the maximum speed was 30 miles an hour, and if under the fair preponderance of the evidence the jury finds that the decedent was operating his motorcycle in excess of that speed, he would be guilty of negligence, as a matter of law, and under those circumstances the plaintiff would not be entitled to recover, on the ground that nowhere in the Court's instructions does the Court say that negligence of the speed law is negligence per se, or negligence as a matter of law. I think the Court does say that it is negligence, but not as a matter of law. You do not ring the bell.

"THE COURT: No, sir. I quit doing that."

In many lawsuits, attorneys for both sides, in their zeal, propose instructions which slant to their individual benefit. If all such instructions were given, the jury would

be confused. It is the duty of a trial judge not to confuse the jury, but to advise and instruct its members as to the law applicable to the particular case. This is a very grave and important responsibility. The trial court in this case recognized and accepted that responsibility. The case was fairly tried and presented to the jury. We find no errors in the record.

The judgment is affirmed.

GRADY, C. J., MALLERY, DONWORTH, and WEAVER, JJ., concur.

[1]Reported in 253 P. (2d) 632.