## MacHALE v. UNITED STATES.

### No. 1721.

United States District Court
W. D. Washington, N. D.
Oct. 4, 1948.

Rummens & Griffin, of Seattle, Wash., for plaintiff.

J. Charles Dennis, U. S. Atty. and Frank Pellegrini, Asst. U. S. Atty., both of Seattle, Wash., for defendant.

---

[1] Defendants may submit a form of final order, to which plaintiff will be granted exception.

BLACK, District Judge.

This is an action by the widow and administratrix of decedent to recover judgment against the United States for damages and funeral expenses as a result of accidental death. The action is brought under the retroactive provision of the Federal Tort Claims Act[1] approved August 2, 1946 to recover for a death in 1946 before the passage of such Act but within the retroactive period covered thereby. The fatality occurred after dark on Western Avenue, an arterial street in Seattle. Patrick B. Mac-Hale, almost fifty-eight, was crossing Western Avenue as a pedestrian. He was struck and killed by a Jeep belonging to the United States. Such motor vehicle at the time was being driven by an enlisted man in the United States Navy, who was operating such in line of duty. Besides the driver there were four passengers in the Jeep. All four passengers were likewise in the Navy and were serving aboard the USS Biloxi, as was also the driver. Riding in the front seat with the driver was a lieutenant junior grade who outranked all the others in the Jeep.

The driver immediately following the accident and also at the trial said he did not see Patrick B. MacHale until the moment of impact. At the trial the lieutenant testified he saw the pedestrian not to exceed ten feet before the impact. At the Seattle Police Station following an investigation at the scene of the accident, the driver signed a statement that he was proceeding at a speed of "about 25 m.p.h.," that he did "not see the man before the Jeep struck him," that he thought the man "was carried about fifteen feet on the hood of the Jeep" and that he "stopped immediately." The lieutenant and each of the other three passengers after the driver had signed such statement subscribed their names to the following sentence: "We have read the above statement and believe it is a true statement of fact."

Two passengers from the rear seat of the Jeep as well as the driver and such lieutenant attended the trial and testified. One of such two rear seat passengers did not know the vehicle had struck anything until after the Jeep stopped and he saw the man on the pavement. The other felt or heard a thud and saw a blur against the windshield without realizing at the moment what it was. No one else witnessed the accident.

If the accident occurred at the crosswalk for pedestrians, plaintiff was clearly entitled to recover. Government counsel conceded such. But the defense contended that Mr. MacHale was struck south of the crosswalk, that he was jaywalking, contrary to the city ordinance of Seattle, and that as a result decedent was guilty of negligence per se which proximately caused and contributed to his accidental death. According to the defendant's witnesses, all of whom were Navy men and all but one from the USS Biloxi, the decedent, after the Jeep stopped some ten or fifteen feet past him, was picked up well south of the crosswalk and near the center of the street. One witness estimated the distance to be about seventy-five feet beyond the pedestrian crossing.

Mr. MacHale's body was carried off the street before the police arrived. When the police got there search for skidmarks was made but none were found and there was no blood visible nor other marks indicating where the man was struck or how far he was carried or the point where the Jeep stopped. Determination of such so far as essential must depend on the testimony of the men in the Jeep, taking into consideration all the other circumstances and conditions shown by the evidence in the light of the decisions of the Washington state court.

Both plaintiff and defendant very substantially depended, among other decisions, upon the Washington supreme court decision of Morris v. Chicago, M., St. P. & Pac. R. Co., 1 Wash.2d 587, 97 P.2d 119, 127, 100 P.2d 19. In that decision the court says where

"there is no evidence to show what the deceased did or did not do immediately preceding the accident * * * the law indulges in a conclusion which presumably is based upon human experience, that the deceased must be presumed to have used due care."

---

[1] In 1948 Judicial Code, see 28 U.S.C.A. §§ 1291, 1346, 1402, 1504, 2110, 2401, 2402, 2411, 2412, 2671–2680.

374

■ There unquestionably was no evidence presented at the trial of this cause of what the defendant did or did not do immediately preceding the accident unless it should be held that the contention of the lieutenant that he saw the pedestrian not more than ten feet away and shouted "look out" before the man was hit suffices.

At this point I may say I am well satisfied from all the circumstances and the evidence as a whole that, first—the lieutenant did not see Mr. MacHale anything like ten feet distant or not until practically the moment of impact, and second—that he did not shout at all until after the collision.

Since the lieutenant was the ranking occupant of the Jeep, in the front seat, with authority over the driver, and naturally subject to be called and was called to explain the accident speedily before some form of Naval tribunal, and since he testified in behalf of the seaman driver at the municipal court trial where the driver was convicted of negligent driving, it is difficult to view him as a "disinterested witness." But under the long-established decisions of this state, unless he was a disinterested witness even if his sketchy claim merely of seeing Mr. MacHale "not more than ten feet away" is enough to comply with the requirement of evidence showing "what the decedent did or did not do" the presumption of due care on decedent's part continues.

On this point the Morris decision, supra, says:

"This presumption (of due care on decedent's part) entirely disappears from the case upon the introduction of competent and material testimony of disinterested witnesses, as to the actions of the deceased immediately prior to and continuing up to the time of the accident,"

It may be noted that the lieutenant merely said he saw decedent "not more than ten feet away" and that he (the lieutenant) shouted "look out." Whether "not more than ten feet" means two feet or five feet or ten was not stated by him. If he did not know how far it was it may be that reasonable minds might interpret "not more than ten feet" as being about five feet. In any event he said nothing whatsoever as to what decedent did "immediately prior to

and continuing up to the time of the accident."

■ Even if the lieutenant were a disinterested witness and even if he had given the requisite information as to the "actions of the deceased prior to and continuing up to the time of the accident," nevertheless under the law of this state the hearing tribunal is not foreclosed by his testimony.

The supreme court in such Morris decision continued, 1 Wash.2d at page 605, 97 P.2d at page 127:

"However, even though there be the testimony of disinterested witnesses, such testimony and all the other competent and material evidence must be submitted to the jury" and therefore in this case to the judge

"unless the court can say * * * that the only reasonable inference which can be drawn therefrom is that deceased failed to exercise that degree of care required of him,"

At the trial police officer Leedle testified that he arrived at the scene a few minutes after the accident; that the driver pointed out on the street the point of impact as being approximately eight paces, or twenty-four feet, south of the south portion of the marked crosswalk; that the driver pointed to a spot on the street where the body was picked up which was fourteen paces, or about forty-two feet, further south.

Neither the driver nor the lieutenant nor anyone at the trial denied that the driver at the scene and soon after the accident had told such to the police officer. However, by the time the occupants of the Jeep were taken to the police station the distance the pedestrian had been carried by the Jeep from the point of impact seems to have shrunk from about forty-two feet to about fifteen feet.

But at the trial the lieutenant stated that the body was not carried on the hood but rolled off at once and that he never had thought the pedestrian was carried about fifteen feet in spite of his signature and subscription at the police station to the written statement of the driver.

The only evidence presented as to the direction of decedent just before his death

was the statement of the lieutenant that he had the impression that the pedestrian was facing Skipper's, that is to the east. From all the evidence it is clear that he had almost crossed to the center line. The left front of the Jeep, its easterly front as it proceeded south, struck Mr. MacHale.

■ There was no testimony giving any reason for this man to walk other than on the crosswalk. The presumption of the law of this state is that until he was shown by satisfactory evidence to be off the crossing he was where he was supposed to be. In the light of all the evidence, made more understandable by the view of the scene, I am satisfied that he would have chosen to and he did actually choose to walk on the pedestrian crosswalk.

I am not convinced that the driver and the lieutenant actually know he was on the crosswalk and nevertheless have knowingly falsely placed him south. He appeared in their vision so suddenly that they had no time in the fractional second to fix his whereabouts with reference to anything. They so wished their striking him to be mitigated that they quite probably after the Jeep was stopped reasoned backwards as is very natural for motorists following an accident, that he must have been beyond the crossing. But they gave no syllable of evidence that before the striking they even noticed the location of the crossing nor why they would have done so if they had, as they say, not yet seen the pedestrian.

Neither at the trial nor at any other time as far as the evidence discloses did the driver explain what, if at all, was the basis for his conclusion that the pedestrian was south of the crosswalk when struck or for advising the police officer that the point of impact was about eight paces south or for his written statement at the police station that the impact was "shortly after I passed the intersection." Nor did the driver give any explanation for the apparent shrinkage from forty-two feet to fifteen feet of the distance the decedent was carried.

■ But had he done so, since he clearly was an interested witness, his testimony would not rebut the presumption of due care favoring decedent.

In view of the written statement of the driver subscribed to by the other passengers as before-mentioned and under all the other evidence at the trial I am convinced that at the time of impact the Jeep was going at least, twenty-five miles per hour. And except as it necessarily slowed momentarily because the car from Elliott Avenue passed in front of it the speed of the Jeep at all times was at least twenty-five miles per hour. I employ the term "at least twenty-five miles per hour" advisedly.

Calculation will demonstrate that at twenty-five miles an hour the Jeep proceeded about thirty-seven feet in one second. Thus, if the lieutenant saw the pedestrian not more than ten feet away he saw him not more than about one quarter of a second away. Or if he saw him about five feet away that was about one-eighth of a second distant. Such calculation causes me to disregard his belief that he shouted "look out" before the impact. A quarter of a second or less would not be reasonably likely to accommodate reaction period plus time to shout "look out."

Aside from mathematical calculation I am completely satisfied by the other evidence and circumstances that whatever he may have shouted was after and not before Mr. MacHale was struck. The driver testified he heard no shout. One passenger in the rear seat felt or heard a thud. He mentioned nothing being shouted or said by the lieutenant. If there had been a shout before the driver or such passenger saw the pedestrian or felt the thud such would have surely been noted and remembered. But the horror of the impact or the thud naturally prevented any subsequent shout registering on the mind or memory of the driver or such passenger.

Another passenger in the rear seat felt no thud and knew of no impact until the Jeep stopped and he saw decedent on the pavement. He testified he heard screaming by the lieutenant. Since the previous impact was unknown to him any subsequent screaming would naturally be noted.

No one in the car or at the trial satisfactorily explained why the decedent was not seen in time to avoid collision. He was in plain sight, whether on the crosswalk or beyond. The street lights and the lights

of signboards, of Skipper's, and of other places would have made him seen by those who looked.

Under the evidence in this case as clarified by my view of the scene of the accident I am satisfied that the reasonable explanation lies in the fact that the Jeep was driven very closely behind the intercepting car in resuming its speed southward. No other reasonable explanation was presented at the trial.

All four of the Jeep occupants at the trial each testified in turn about the southbound Jeep being detained momentarily by this northbound intercepting car that turned from Elliott Avenue going north and east in front of the Jeep. It is significant that each of the four after two years and with the separation of their paths would so similarly recall this intercepting car. I am satisfied from their evidence and the circumstances that the Jeep slowed down just enough to let this car proceed and that the driver then rapidly renewed his speed and passed so close to the rear of such car that he did not see the pedestrian on the nearby crosswalk. The driver was more interested in renewing such speed and proceeding rapidly southward and as. close to the rear of that automobile as he could than he was in looking out for possible pedestrians at the street intersection. As a result he came upon the pedestrian very quickly and in spite of street lights and lights on signboards and places of business saw him only as he struck him.

Unless these four from the Jeep at least unconsciously realize that the intercepting car is the probable explanation of the accident it is strange that all the Jeep occupants who testified remembered that otherwise trivial incident unless they were all exceedingly anxious to get to their destination and unanimously and highly impatient of even that slight retarding of their speed.

But if Mr. MacHale had been south of the crosswalk the further south he had been the greater would have been the opportunity and likelihood that the driver of the Jeep after passing behind the intercepting car would have seen him in ample time to have avoided striking him.

I am satisfied decedent was on the crosswalk where decedent was entitled to the right-of-way. But even if he had been to the south as claimed by defendant and even though such under the ordinance would have been negligence per se, still it is difficult for me to consider that such would have caused or contributed proximately or at all to the accident. In fact, it seems to me any such negligence per se on his part if it had occurred, in this instance, would have reduced the likelihood of accident by giving more chance for timely discovery.

I have not overlooked the driver's testimony at the trial that the impact was opposite a point between a certain pole on the westerly side of the street and the bus shed. Even if he were a disinterested witness it still would be incomprehensible to me that when looking ahead, as he testified, and not seeing the man until the actual impact that he could at the same time accurately look at right angles directly to the west and fix the Jeep's position at that terrifying fraction of a second as opposite a point between such pole and shed.

Nor have I overlooked the statement of a couple of witnesses that something occured at different points considerably apart which each witness respectively referred to as opposite the entrance to Skipper's restaurant on the east side of the avenue. But Skipper's faced diagonally with its entrance toward the southwest. Therefore, it was not helpfully used for location reference. The plat should make clear the confusing direction of Skipper's and of its entrance and front walk. The view of the scene certainly did.

■ In the light of all the evidence supplemented by my view as mentioned, under the law of this state and the decisions of the supreme court of this commonwealth, I am well satisfied that Mr. MacHale at the time he was struck was on the crosswalk. I am further well satisfied that the defendant's driver and therefore the defendant was negligent and that such negligence was the proximate cause of the accident and of decedent's death.

■ I deem thirteen thousand five hundred dollars plus eight hundred dollars as. funeral and burial expenses a proper recovery for plaintiff in his action. There was no dispute as to such eight hundred.

dollar item in the event plaintiff was entitled to prevail at all. The amount of thirteen thousand five hundred dollars as damages in addition to the funeral and burial costs was arrived at by me after taking into consideration all the proper elements and factors disclosed by the evidence which under the decisions of the supreme court of this state are to be considered for such determination.

As I some days ago stated, I am satisfied from the evidence, including the employment record admitted in evidence, that the earning expectancy of the decedent, had he lived, would in all reasonable probability have been substantially less than his life expectancy. The probability is that a man fifty-eight years of age will, during the rest of his life, suffer first a reduction in his earnings and then some considerable time before his death a termination of his employment. It is highly probable his income will decrease and fairly probable will ultimately end before his death. But the cost of his maintenance and the burden of his care will continue or quite probably become greater with the likelihood of doctors, hospital and nursing expense.

In Kellerher, Administratrix v. Porter, 189 P.2d 223, a death case 1948 opinion of this state's supreme court, it is stated at page 235 that the recovery must, or at least properly may, in respect to future pecuniary benefit to be anticipated from decedent's earnings be discounted to present value. Under the law as laid down in that recent opinion and other decisions of this state's supreme court, thirteen thousand five hundred dollars in addition to eight hundred dollars previously mentioned is the nearest I can come under the evidence to the proper amount to be allowed plaintiff for her husband's death through defendant's negligence.

Certainly that recovery is not in any way excessive. But as touching upon his physical condition it is to be noted that his employment record disclosed that at least as long ago as 1941 he was affected by some trouble with his nervous system, symptomized in part by a tremor of his fingers, which condition according to one part of his widow's testimony apparently continued until his death and quite likely was the occasion of his being absent from work the day of the accident. At least he was getting some pills and vitamins from his doctor and presumably for such condition. But aside from that the allowance I have made is the best I can determine in view of the evidence and all the factors to be considered.

Counsel on both sides have most industriously briefed the law of this state as to the doctrine of last clear chance upon the theory that I might conclude that decedent was south of the crosswalk. But in view of my conclusion that he was actually on the crosswalk it is unnecessary for me to determine whether that doctrine would have been applicable. In fact, as disclosed by the respective briefs of counsel, over the years our state supreme court on that interesting phase of the law has shifted somewhat back and forth from time to time. In any event under the recent decision in Everest v. Riecken, 193 P.2d 353, decided by our state supreme court in May, 1948, I do not believe that doctrine would be helpful to plaintiff if Mr. MacHale had not been on the crosswalk.

As I have previously indicated, even if the defendant had been south of the crosswalk and even though the doctrine of last clear chance had not been available to plaintiff, I do not understand how his being south of the crosswalk could in fact have contributed to the accident.

But I need not determine that phase either since, as previously stated, I find he was on the crosswalk where he had the right-of-way.

Under the Federal Tort Claims Act, 28 U.S.C.A. § 2678, the court is to fix the amount of plaintiff's attorney fees which must not exceed twenty per cent. of the recovery and must be a portion of and not in addition to the award.

A separate hearing upon this special question was had after announcement of decision was made that plaintiff would recover and the amount. At such separate hearing plaintiff personally, her counsel, and defense counsel were present. While plaintiff and her attorneys on such phase could quite conceivably have different interests and different views, in fact they agreed

completely that the attorneys should as their fees receive ten percent. of the recovery except that in the event of an appeal being perfected and submitted the total attorneys fees for the trial in this court and on appeal would be the twenty per cent. allowed by law as a maximum with an attorney fee between the two if appeal be had without submission. Such being in each respect very reasonable, the court approves such varying fee dependent on future events as just stated. Plaintiff's counsel are to be commended for their modest request for fee for the trial. Counsel for the government in open court stated there was no objection to such allowance or to the varying increases dependent on possible future appeal. It will be deemed that such variable allowance is the law of this case as to the counsel fee. While there is no express authority in the Federal Tort Claims Act for such variable fee dependent on future events there is no express prohibition of such. In fact it would seem that authority for such while not express is reasonably implied.

Findings, conclusions and decree for plaintiff may enter.