[No. 36567. En Banc. October 17, 1963.]

SHIRLEY MONDOR et al., *Appellants*, v. LOIS RHOADES, *Respondent.**

*Tonkoff, Holst & Hopp*, for appellants.

*Palmer, Willis & McArdle*, for respondent.

HALE, J.—Early in the evening of November 10, 1960, two automobiles collided in an uncontrolled, open, right-angle intersection in Yakima. The streets were damp, but it was not raining. It was dark; both cars had their head-lights on; the speed limit for each vehicle was 25 miles per hour.

*Reported in 385 P. (2d) 722.

Shirley Mondor, plaintiff, was driving his car west on West Prasch Avenue; his wife was a passenger, seated on the right front seat. He testified that he was driving 20 miles per hour when approaching the South First Avenue intersection, but slowed almost to a stop at a point about one-half car length before entering it. He said that he looked first to his left, saw it as clear, then looked to his right and first observed the headlights of defendant's approaching car at a point when it was about two-thirds of a block away. Plaintiff Mondor said that he continued into the intersection at a speed of about 5 miles per hour, increasing to about 12 miles per hour, and did not see defendant's car again until it was 20 feet away, at which point he estimated it was coming at the rate of 50 to 60 miles per hour. He could have stopped his car within 2 or 3 feet had he applied his brakes. He said that his car's right front rammed the left front of the defendant's car.

Lois Rhoades, the defendant, stated that she had made a right turn from Lenox Avenue on to First Avenue, one block north of the accident, at 10 miles per hour, and proceeded south at about 20 miles per hour on First Avenue into the intersection with West Prasch Street when her car was struck on the left front fender by the Mondor car.

Her friend, Betty Jones, was a passenger in the right front seat; they had been shopping together earlier. They intended to stop and pick up another passenger at an address about 3 blocks from the intersection.

Defendant Rhoades stated that, as soon as her vision was clear of view-obstructing houses as she approached the intersection at about 20 miles per hour, she looked first to her right at a point 50 to 60 feet from it and saw that it was clear; she then looked to her left to see the plaintiffs' car for the first time. It was already in the intersection, about a car length away, approaching from her left. She saw only the headlights of the car and said that she had time neither to apply her brakes nor to swerve. She agreed with plaintiff driver that his car struck her car at the left front fender.

The intersection was 33 feet square. Impact occurred at a point 12 feet 10 inches from the extended north curb line of West Prasch, and 10 feet 6 inches from the extended west curb line of South First, and hence within the respective lanes of travel for each vehicle. The resultant of the two forces carried the vehicles to the southwest corner of the intersection. Extensive personal injuries and property damages resulted.

Raymond Chavers, a truck driver, unacquainted with any of the parties to the accident, called as a witness by plaintiff, testified that he was standing at an upstairs window of a two-story home looking at the street and saw the collision. He said that the Rhoades car rounded the 90-degree corner of Lenox and First Avenue one block north of the point of collision at 30 to 35 miles per hour and accelerated to 55 to 65 miles per hour within the block to the point of collision.

There were no skidmarks, no physical evidence that either party applied brakes or took evasive action. Physical aspects of the accident, including distances traveled after impact, damages to the vehicles, and the situations of the parties before the accident, were more consistent with defendant's version of her speed at 20 to 25 miles per hour than with plaintiff driver's impression of her speed at 50 to 60 miles per hour gained by the latter during a split-second glance while defendant's car was bearing down on him within a 20-foot time-distance interval.

Thus we have a classic right-of-way case, with defendant in the role of favored driver, and plaintiffs disfavored under the law. Plaintiffs sought recovery under the deception rule of *Martin v. Hadenfeldt*, 157 Wash. 563, 289 Pac. 533, and the application of the doctrine of last clear chance. Defendant cross-claimed by virtue of the right of way accorded her by statute. From a judgment on a verdict for the defendant without award of damages, the plaintiffs appeal.

Plaintiffs, as appellants, assign error to the court's refusal to give certain instructions to the jury, and to the court's

withdrawal of the last-clear-chance doctrine in both its phases from consideration by the jury.

 Plaintiffs first assign error to the court's refusal to give their proposed instruction No. 6,[1] pointing to *Robison v. Simard*, 57 Wn. (2d) 850, 360 P. (2d) 153, and *Watson v. Miller*, 59 Wn. (2d) 85, 366 P. (2d) 190, to support it. The *Robison* case, *supra*, we find to be authority for the proposition that, where there is substantial evidence of it, the question of the contributory negligence on the part of the favored driver should be submitted to the jury. It can hardly be said to authorize plaintiffs' requested instruction No. 6.

Not so, however, with the *Watson* case, *supra*, where the requested instruction is approved. In that case, the favored driver, the plaintiff, received an adverse verdict, presumably under this instruction, and this court in reviewing the record concluded that the defendant should have been held negligent as a matter of law but that it was not error to give the requested instruction. The cause was remanded to allow plaintiff a new trial on all issues except that of defendant's negligence.

The requested instruction, though seemingly proper in the *Watson* case, *supra*, now appears to have many faults. We doubt that the jury should be told that the favored driver cannot proceed *blindly* into an intersection, for neither should the disfavored driver.

The instruction starts out in an argumentative vein, and proceeds to express the favored driver's duties argumentatively throughout. Then, too, the word *blindly* is more contentious than descriptive, as is the case with most adverbs when used in instructions.[2] Moreover, we are doubtful if

---

[1] "You are instructed that the favored driver cannot proceed blindly into an intersection ignoring a vehicle which may be in the intersection. Such favored driver is required to use ordinary care to avoid a collision, either by stopping his vehicle if he can do so by the exercise of reasonable care or by swerving his vehicle to one side or the other if he or she has reasonable time and opportunity to do so. The favored driver cannot take the right of way when he sees, or in the exercise of reasonable care should see, that to do so will inevitably result in collision, if he has time and opportunity to avoid the collision."

[2] Jurisprudence, like physics, is a poor place for adverbs. One may be required to pay taxes, but could he be required to do so *cheerfully*?

judges ought to tell people how to act in emergencies, by advising them to stop, or to swerve to one side, or over to the other side, according to the dictates of reasonable care. In some cases, prudence might require a driver to accelerate so as to avoid the impact—or even to reverse his car. Proposed instruction No. 6 is not a good candidate for inclusion in a proposed volume of uniform jury instructions, and it was not error for the trial court to refuse it.

▮ Appellants assign error to the court's striking out the last-clear-chance doctrine. A review of the facts and the split-second time intervals governing as the two cars approached each other in the nighttime demonstrates that the last clear chance was not shown or to be inferred. Moreover, plaintiffs, in approaching and entering the intersection at an admitted speed of 5 miles per hour, had an equal if not better chance than defendant to avoid the accident. *Glasper v. Westbo*, 59 Wn. (2d) 596, 369 P. (2d) 313 (1962); *Conklin v. Seattle*, 58 Wn. (2d) 189, 361 P. (2d) 578 (1961); *Everest v. Riecken*, 30 Wn. (2d) 683, 193 P. (2d) 353 (1948).

The routine nature of this case, involving as it does a major source of litigation, induced this court to request counsel at bar, counsel with similar cases pending, and the University of Washington Law School to give us the benefit of their views on a re-examination of the fourth, or deception, rule of *Martin v. Hadenfeldt*, 157 Wash. 563, 289 Pac. 533. We wondered if the deception rule was meeting the test of time. We thought that possibly the numerous cases applying it and construing it had caused a kind of judicial erosion to set in that had at long last destroyed the deception requirements and left the parties where the rule originally found them, in a race for the intersection with the judgment to the victor. And we wondered if perhaps an absolute rule ought not to be adopted in the interest of certainty to assure that statistically the driver having the right of way at law would have it in the courts. To our queries, the lawyers have responded most graciously and effectively, and we are further grateful to Professor John

W. Richards for a paper prepared by him in analysis of the right-of-way rule at uncontrolled intersections.[3]

Should the deception rule of *Martin v. Hadenfeldt, supra*, be abandoned and absolute liability be fixed upon the disfavored driver?

From our own research, we would say that the first attempt by statute to declare rules of the road for automobiles took place in Washington in 1905, Laws of 1905, chapter 154, p. 293. This act merely established speed limits and gave horses the right of way—particularly frightened horses—and directed one to pass both approaching and overtaken vehicles or horses on the right. The act was silent as to intersections except to limit speeds at crossings and at crosswalks to 4 miles per hour. In 1909, the speed limit at intersections was incorporated into the newly adopted criminal code, and to pass through an intersection within a city or town at more than 4 miles per hour was declared to be a misdemeanor. Again the legislature made no attempt to establish rights of way. See Laws of 1909, chapter 249, § 279, p. 976. Nor did the Laws of 1915, chapter 142, p. 385 (our first comprehensive motor vehicle code), containing for the first time a reference to rules of the road (§ 26), establish preference at intersections other than to enjoin all drivers to pass to the right of the center when going through or turning to the right or the left at the intersection; and this same provision was carried forward by Laws of 1919, chapter 59, p. 113.

Cities and towns augmented the rules of the road by ordinance. Spokane apparently had an ordinance in effect in 1916, giving the right of way at intersections to all vehicles traveling north or south and requiring drivers going east and west to yield to them. In upholding this right of way, this court in *Bullis v. Ball*, 98 Wash. 342, 167 Pac. 942, in language undiluted by the cases later construing *Martin v. Hadenfeldt, supra*, said of this ordinance:

[3]The paper is untitled and undated and apparently is a memorandum of a lecture, but it is on file at the University of Washington Law School Library.

" . . . The ordinance placed the duty upon plaintiff to apprehend defendant at the intersection, before it imposed upon defendant the duty to see the plaintiff. The purpose of the ordinance giving to vehicles moving in a northerly or southerly direction the right of way at street intersections was to prevent collisions, to obviate the very exigency which here arose. It was foreseen that at some time vehicles approaching street intersections would very probably meet and collide. To prevent this, the ordinance above referred to was enacted. Its purpose demands no explanation. It is quite clear. The rights and duties which it creates are equally clear. The driver on the street running north and south must exercise that degree of care which is ordinarily commensurate with the safety and welfare of others with whom he may come in contact at street intersections. But while it is true that he must exercise ordinary care, the superior right to passage over the intersection is his. It is a right expressly conferred upon him by authoritative enactment, a right which must be observed and respected by others using streets at the points of intersection. This priority of right naturally and necessarily creates a corresponding duty on the part of the traveler using the street running east and west, a duty which consists in the exercise of a degree of care commensurate with the superior right of the person traveling the street running north and south. The duty necessarily implies that the driver of a vehicle on a street running east and west shall slacken speed for the purpose of observing vehicles approaching the intersection on the street running north and south, and should such vehicles be within a reasonable distance of the intersection, to wait until they have passed before attempting to continue across the intersection. The greater duty and the higher degree of care to be observed in such a situation is upon the person using the easterly and westerly street . . ."

In 1921, the state, by statute, pre-empted this area of the road rules and declared that drivers, when approaching highway intersections, look out for and give right of way to vehicles on their right simultaneously approaching a given point. Laws of 1921, chapter 96, § 28(6), p. 273. The court tried to solve the problem raised by the word "simultaneous" by preserving the old common-law rule of priority: the first car into the intersection was held to have the right of way. *Day v. Polley*, 147 Wash. 419, 266 Pac. 169; *Novotney*

*v. Thompson*, 144 Wash. 155, 257 Pac. 236. Apparently to get rid of the priority theory, the legislature adopted in Laws of 1927, chapter 309, § 41 (14), p. 802, 806, the present right-of-way rule now set forth with slight changes in language in RCW 46.60.150:

"Every operator of a vehicle on approaching public highway intersections shall look out for and give right of way to vehicles on his right, simultaneously approaching a given point within the intersection, and whether his vehicle first reaches and enters the intersection or not . . ." RCW 46.60.150.

*McHugh v. Mason*, 154 Wash. 572, 283 Pac. 184 (1929), coming under the above statute, hints at the deception rule and anticipates *Martin v. Hadenfeldt, supra,* though *Garrett v. Byerly*, 155 Wash. 351, 284 Pac. 343, 68 A.L.R. 254 (1930), seems to have revived the old priority rule that the right of way belonged to the vehicle first entering the intersection.

We think it was in the light of these decisions that *Martin v. Hadenfeldt, supra,* sought to give definition to the statute and to abrogate the old race-to-the-intersection rule, and yet not fix the right of way as absolute. That this is so is evident by its express overruling of *Garrett v. Byerly, supra.* Many students contended, and do so now, that the deception rule was a judicially legislated amendment to an otherwise clear statute, and that the statute itself cured the priority rule and imposed absolute responsibility upon the driver on the left. This point of view was vigorously presented here. We recognize, too, that the right of way granted by the statute can be lost through overrefinement in definition when sought to be applied to two automobiles moving toward each other at an uncontrolled intersection.

The driver on the right should prevail in nearly every case for he is nearly always in the right. We are concerned, though, that the advantage afforded him at law may be lost through limitations in the power of expression when the acts and circumstances of the impact are described.

When one reads a record describing two cars bearing down on each other at right angles at speeds varying in estimate from 20 to 60 miles per hour, observed at distances

varying in surmise from 20 to 330 feet, small wonder that the deception rule of *Martin v. Hadenfeldt, supra,* and the two phases of the last-clear-chance doctrine may become lost in the welter of conflicting evidence, and the minutiae of the descriptive arts.

Small wonder, too, that by the time a number of witnesses have described the same incident, the right-of-way rule disappears and the old race-to-the-intersection rule revives —a concept thought to be done away with by the 1927 statute and the *Martin v. Hadenfeldt, supra,* deception rule. The farther we are in time from *Martin v. Hadenfeldt, supra,* it seems, the closer become the tolerances by which the favored driver's contributory negligence or his chances to avoid the accident are measured. These are the ideas that persuade many students to argue for the absolute right of way.

█ We know that the right of way granted to the driver on the right is a strong one and ought not to be lost in the maze of details arising from split-second computation of time and distance. But it is not an absolute. The law, like life itself, has room for few absolutes, and we are fearful of granting one here. Room must be left for the extreme case, the case where the driver on the left is able to demonstrate that the favored driver so wrongfully and negligently operated his car as to create a deception tantamount to an entrapment, a deception of such marked character as to lure a reasonably prudent driver into the illusion that he has a fair margin of safety in proceeding into the intersection and on through it. If the behavior of the car and driver on the right would not deceive the reasonably prudent driver on the left to such an extent as to entrap him, then the disfavored driver has failed to yield the right of way. See *Chavers v. Ohad,* 59 Wn. (2d) 646, 369 P. (2d) 831, and the specially concurring opinion per Rosellini, J., at p. 653.

Seventeen sessions of the legislature have met since *Martin v. Hadenfeldt, supra,* became the law in 1930, and that they have considered traffic problems at intersections is shown by amendments to the section, yet leaving the rule of the road and deception phase of the case undisturbed. See Laws

of 1937, chapter 189, § 88, p. 899; Laws of 1955, chapter 146, § 3, p. 645; and Laws of 1961, chapter 12 (RCW 46.60.150), p. 389. If the legislature wishes to make the right of way absolute, they may do so in express language. We must decline.

Judgment affirmed.

OTT, C. J., HILL, FINLEY, WEAVER, ROSELLINI, HUNTER, and HAMILTON, JJ., concur.

DONWORTH, J., concurs in the result.