[No. 39097.    En Banc.    November 27, 1968.]

Huey L. Hester et al., *Appellants*, v. Harry Watson, *Respondent*.*

*Reese & Mitchell,* by *James B. Mitchell,* for appellants.

*Minnick & Hahner* and *R. Michael Kight,* for respondent.

Hill, J.—Mr. and Mrs. Huey L. Hester, with Mr. Hester driving, were traveling in a southerly direction on the Dalles Military Road. When they reached its intersection

*Reported in 448 P.2d 320.

with Washington State Primary Highway 125 (which at that particular point runs roughly east and west), they stopped at the stop sign. Mr. Hester looked to the east and saw the pickup truck being driven by Mr. Harry Watson from what seemed to Mr. Hester a considerable distance away;[1] he looked west, and there was nothing coming from that direction; he then made a right turn onto Highway 125 and proceeded westerly, accelerating his speed. Some 225 feet[2] from where it had come onto Highway 125, the Hester car was rear-ended by the Watson car. The cars locked bumpers, and the Hester car was pushed another 330 feet back and forth across the highway, and then off the south side and into a field.

The Hesters brought this action to recover for the injuries they sustained and the damage to their car. Mr. Watson cross-complained, asking for damages for the injuries he sustained and the damage to his car. The jury verdict denied recovery to either party, which was tantamount to a determination that both parties were negligent. The Hesters have appealed from the judgment of dismissal against them; Mr. Watson did not cross-appeal.

The jury's determinations of negligence on the part of both parties may have been correct; however, it is axiomatic that a party is entitled to have the court instruct the jury on his theory of the case if there is substantial evidence to sustain it. *Kelsey v. Pollock,* 59 Wn.2d 796, 797, 370 P.2d 598 (1962). The issues on this appeal become: Did the trial court fail to properly instruct the jury on the Hesters' theories of the case; *i.e.,* no negligence because the Hesters' car was a preceding car and, if negligent, still entitled to recover on the basis that Mr. Watson had the last clear chance to avoid the collision?

---

[1] Mr. Hester's testimony was that the Watson pickup was just crossing the railroad track, some 1,138 feet away.

[2] The court accepts the 225 feet figure determined by the investigating officer, based on his observation of typical point-of-impact debris at approximately that distance from the intersection, while acknowledging that Mr. Watson's estimate was "100 to 150 feet."

The trial court instructed the jury on the theory of the defendant Watson that this was an intersection case; and it. refused to instruct on the Hesters' theory that it was a preceding and following-car situation. It also refused to instruct on either phase of the last clear chance doctrine.

The trial court treated the negligence of Mr. Hester as a disfavored driver entering an intersection as a jury question on the basis of the then[3] recognized rule:

Automobiles which collide as a result of the disfavored driver's having failed to leave a fair margin of safety, are simultaneously approaching the intersection even if the accident occurred outside the bounds of the intersection. (Instruction No. 17.)

We have recognized that if a disfavored driver enters an intersection at such a time and place as to produce an emergency situation in which the favored driver is unable, in the exercise of reasonable skill and judgment, to avoid a collision, then the disfavored driver's failure to yield the right of way at the intersection would constitute negligence per se, even though the resultant collision occurred outside the bounds, i.e., the physical limits, of the intersection. *Petersavage v. Bock*, 72 Wn.2d 1, 431 P.2d 603 (1967), *Nelson v. Molina*, 53 Wn.2d 412, 334 P.2d 170 (1959).

The question presented by this case and by the two cases just cited is: How far beyond the intersection does a driver entering an arterial at an intersection have to travel on the

[3]This collision occurred in 1964; the legislature substantially changed the rules of the road in 1965, and the applicable statute, RCW 46.61.190(2), now reads as follows:

Vehicle entering stop or yield intersection. (1) Preferential right. of way at an intersection may be indicated by stop signs or yield signs as authorized in RCW 47.36.110.

(2) Except when directed to proceed by a police officer or traffic-control signal, every driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop as required by RCW 46.61.360 subsection (2), and after having stopped shall yield the right of way to any vehicle which has entered the intersection from another highway or which is approaching so closely on said highway as to constitute an immediate hazard during the time when such driver is moving across or within the intersection. RCW 46.61.190(2).

arterial, and for how long, before a jury is entitled to find him to be a preceding driver, if his car is rear-ended by a car that was already on the arterial?

*Petersavage v. Bock, supra,* holds, as a matter of law, that a driver who has entered upon an arterial at an intersection and has been there only 2 or 3 seconds, and traveled less than 50 feet beyond the intersection, has not been on the arterial a sufficient time or distance to have attained any status other than that of a disfavored driver entering an intersection; and, as such, he cannot be considered a preceding driver when his car is rear-ended by a car already on the arterial; consequently, he was not entitled to have an instruction given on the duties of a driver of a following or overtaking car.

*Nelson v. Molina, supra,* holds that where there is evidence that the driver entering an arterial at an intersection has been on the arterial 7 or 8 seconds and traveled a hundred feet thereon his negligence as a disfavored driver ceases to be a matter of law, and that the jury should be permitted to determine whether he was a disfavored driver entering an intersection, or whether he was a preceding driver when rear-ended by a car already on the arterial. Consequently, Molina was entitled to the benefit of a following, or passing-car instruction, or both. In short, it was a question which the jury could determine either way.

Had the jury ignored the Hesters' testimony and considered only Mr. Watson's own testimony, the testimony of the investigating officer as to what Mr. Watson told him, or the computations of Mr. Watson's own witness, the jury could have found therefrom that Mr. Watson was the driver of a following car and that the collision was proximately caused by his negligence as such.

MR. WATSON'S TESTIMONY: He testified that he was about half way between the railroad track and the intersection (more than 500 feet east of the intersection) when he saw the Hester car approaching the stop sign. He then looked into his rear-view mirror and when he looked ahead again the Hester car was right in front of him and the collision

was unavoidable.[4] The collision occurred some 225 feet west of the stop sign. By his own admission he traveled more than 725 feet (better than 8.5 seconds at his estimated speed of 55 miles an hour) without paying any attention to traffic conditions directly ahead of him. This a jury might well regard as negligence proximately causing the collision.

MR. WATSON'S STATEMENT TO THE INVESTIGATING OFFICER: State Patrol Trooper, Kenneth A. Graves, testified that Mr. Watson told him that he (Watson) was approximately 100 feet from the intersection when the Hesters "pulled out in front of him."

This meant that Mr. Watson had the Hesters in sight while he was traveling at least 325 feet, while they traveled 225 feet during a time estimated at 7.6 seconds. The jury could certainly conclude from such testimony that this was a following-car situation.

THE COMPUTATIONS OF MR. WATSON'S WITNESS: One computation was that it took the Hesters 7.6 seconds to travel 225 feet from the stop sign, accelerating from a stop to 40 miles an hour. Another computation indicated that in the same time Mr. Watson, traveling at 55 miles an hour, traveled 615 feet, which would place him 390 feet east of the stop sign when the Hesters were starting from the stop sign.

■ Under this or either of the two preceding versions as to where Mr. Watson was when the Hesters entered upon the arterial, a jury could find that he was a following driver for distances varying from 725 feet to 325 feet, and for a minimum of 7.6 seconds.[5]

---

[4]This testimony is contrary to statements which the Hesters and the investigating officer testified Mr. Watson made to them. These are set forth later in the opinion.

[5]The time computation as indicated is based on the Hesters having attained a speed of 40 miles an hour while traveling the 225 feet from the stop sign to the point of impact. Mr. Hester testified that he did not really know what his speed was at the time of impact; it might have been only 20 or 30 miles an hour. Obviously, the lower the speed attained, the longer it took them to travel the 225 feet and the longer they were on the arterial.

The court's failure to instruct[6] on the theory that this was a following-car situation—there being substantial evidence to support each theory—was reversible error. *Harris v. Fiore*, 70 Wn.2d 357, 423 P.2d 63 (1967); *Carraway v. Johnson*, 63 Wn.2d 212, 386 P.2d 420 (1963); *Kelsey v. Pollock*, 59 Wn.2d 796, 370 P.2d 598 (1962); *Lidel v. Kelly*, 52 Wn.2d 238, 324 P.2d 817 (1958); *DeKoning v. Williams*, 47 Wn.2d 139, 286 P.2d 694 (1955).

As we said in *Harris v. Fiore, supra,* "If a given set of facts supports two or more theories of law, the court must instruct on all the theories to which the facts pertain."

Counsel for Watson seek to explain the failure to give an instruction on the duties of a driver of a following car by pointing out that an instruction was given setting out the duties of a driver overtaking and passing another car upon the highway.[7] It is also pointed out that in *Nelson v. Mo-*

---

[6]The Hesters proposed an instruction, which was as follows:

"You are instructed that the duty is upon the driver of a vehicle which is following another vehicle to keep such distance from the vehicle ahead of him, and to maintain such observation of the vehicle ahead of him, that by the exercise of reasonable care, such emergency stop as may be dictated by ordinary traffic conditions may be safely made." (Proposed instruction No. 7.)

[7]Any person driving a vehicle upon any public highway of this state and overtaking another vehicle proceeding in the same direction shall pass to the left of such overtaken vehicle; provided, that it shall be unlawful for any person to pass any vehicle overtaken unless he shall have a clear and unobstructed view ahead for a distance sufficient for safe passing, all factors considered. Any person driving a vehicle upon any public highway and being overtaken by any vehicle proceeding in the same direction shall keep to the extreme right hand side of such public highway and shall not accelerate his speed until the overtaking vehicle shall have resumed a driving position and speed ahead of him. The overtaking vehicle shall drive clear of the overtaken vehicle and shall continue its overtaking speed until it has passed the overtaken vehicle and shall have resumed its driving position to the right of such public highway. No person driving any vehicle upon any public highway outside incorporated cities and towns and overtaking another vehicle proceeding in the same direction shall overtake such vehicle or drive within a distance of less than fifty feet of such overtaken vehicle for such purpose without first signaling his intention to pass by use of horn or other sounding device. (Instruction No. 20.)

*lina, supra,* the two theories presented to the jury were that Molina was either a disfavored driver "entering an intersection," or had become the driver of a preceding car and was entitled to an instruction on the duties of an "overtaking and passing driver."

In that case, Nelson had attempted to pass Molina after the latter had come onto the arterial at the intersection, but seeing an oncoming car in the passing lane he had swung back behind Molina to avoid a head-on collision and had rear-ended Molina. The overtaking and passing instruction was appropriate in that situation.

The present case, however, is not an overtaking and passing case. Watson made no attempt to pass the Hester car. The following-car instruction was appropriate and necessary to present the Hesters' theory of the case, and should have been given.

The Hesters also urge, as previously indicated, that their requested instructions on both phases of last clear chance should have been given, even if the jury found that they were negligent. This seems, at first glance, like a classic last clear chance case: If the Hesters were negligent in driving their car onto and proceeding down the highway ahead of Mr. Watson, he could have turned into the passing lane and avoided hitting them during the time it took the Hesters to travel 225 feet on Highway 125—a minimum of 7.6 seconds —and while he was traveling between 325 and 725 feet, based on his own testimony and out of court statements.

The difficulty in determining the applicability of last clear chance to the situation here is Mr. Watson's testimony that, after he saw the Hester car when he was more than 500 feet from the intersection, he did not see it again until immediately before the collision when it was unavoidable.

This makes the application of the first phase of the last clear chance (*i.e.,* where a defendant did see a plaintiff in a

position of peril),[8] dependent on there being evidence from which the jury could find that Mr. Watson, despite his testimony to the contrary, did see the Hesters in time to avoid the collision.

There is such evidence, and it comes from two sources—the Hesters and the state patrol trooper who investigated the collision. Mrs. Hester testified that following the collision Mr. Watson said, "I am sorry, it was my fault. Something went wrong with my arm." Mr. Hester testified that Mr. Watson said he was sorry, that it was his fault, something struck him in the arm.

(While Mr. Watson denied making these statements, the jury could have believed the Hesters and concluded therefrom that he did see their car in time to take some evasive action.)

We quote an excerpt from the testimony of State Patrol Trooper Kenneth E. Graves:

Q. And then did you talk to Mr. Watson about how the accident occurred? A. Yes. Q. What did he tell you at that time? A. Well, he advised me that he was southbound[9] on 125 toward Milton-Freewater, and that he saw this car approaching the stop sign, and that he glanced in his mirror, and, when he glanced back, he was approximately 100 feet from this particular intersection and the vehicle pulled out in front of him. Q. Did he make any statement concerning whether or not he could have avoided the accident? A. He said that he attempted to avoid it but that he couldn't. Q. Was anything else said along that line by Mr. Watson? A. No. I asked him if there was any northbound traffic, and he advised me no. Q. Did he say anything to you which would tend to indicate that he felt he might have been able to avoid the accident? A. He just stated that he attempted to avoid it but he couldn't.

---

[8]See *Patterson v. Krogh*, 51 Wn.2d 73, 81, 82, 316 P.2d 103 (1957), from which the following statement of the first phase of last clear chance is taken: " '. . . [W]here the defendant *actually* saw the peril of a traveler on the highway and should have appreciated the danger and failed to exercise reasonable care to avoid injury, such failure made the defendant liable, although the plaintiff's negligence may have continued up to the instant of the injury; . . . ' "

[9]Mr. Watson was traveling south to Oregon. At that particular moment his direction was southeasterly, and more east than south.

(This would indicate that Mr. Watson had the Hesters in view from the time they came onto the highway. He traveled 325 feet, while they traveled 225 in 7.6 seconds, and he neither turned into the other lane nor put on his brakes. The jury does not have to believe under these circumstances that he could not have avoided the accident. Mr. Watson did not deny that this conversation occurred.)

■ It was a question for the jury as to whether Mr. Watson did see the Hesters' car in time to avoid the collision, and the first phase of last clear chance should have been submitted to the jury.

■ The second phase of last clear chance applies where a defendant actually did not see the perilous situation but should have (and that Mr. Watson should have seen the Hesters in a position of peril, there is no doubt). For a plaintiff to recover under this phase, his negligence must have terminated, or culminated in a position of peril from which he could not, by the exercise of reasonable care, have extricated himself (see *Patterson v. Krogh, supra*).

It would appear that if the Hesters were negligent it persisted until the time of collision, and that they might have extricated themselves by driving off onto the shoulder of the road, although they were oblivious of the danger.

Hence, we conclude that the trial court did not err in refusing to instruct on the second phase of last clear chance.

We would make it clear that we are not holding that the trial court erred in submitting this to the jury as an intersection case, but that if the Hesters were negligent the applicability of the first phase of last clear chance was a jury question, but not the second phase.

We further hold that an instruction or instructions relative to the duties of the driver of a following car should have been given to get the Hesters' theory of the case before the jury; and that the instruction on overtaking and passing was not sufficient for that purpose.

The judgment of dismissal appealed from is set aside, and the cause is remanded for a new trial on the issues raised by the complaint of the Hesters.

Finley, C. J., Hunter, Hamilton, and McGovern, JJ., concur.

Hale, J. (dissenting)—The haunting subtleties of phase one and phase two, last clear chance, emanating from the majority opinion, suffused as they are with space-time calculations based necessarily upon expanding and diminishing estimates of speed and distance, and further complicated by computations as to acceleration and deceleration, are beyond my comprehension. Accordingly, I dissent. When the court takes a simple, straightforward rule of law laid down by the legislature to protect travelers upon arterial highways, and makes it depend upon the intricacies of calculus as the basis for its enforcement, I think we are in trouble.

Basically, this is a simple case. I see nothing more to it than a situation in which the party seeking recovery knowingly and negligently failed to yield the right of way to a car approaching him on an arterial highway. Mr. Hester knew the car was approaching the intersection; he saw it coming. He said he saw it coming at a high but lawful rate of speed. Notwithstanding this knowledge—not only actual but chargeable to him in law—he drove onto the highway at an undetermined rate of acceleration in front of the approaching car to be struck in the rear by it. To me, this amounts to contributory negligence as a matter of law and deprives Mr. Hester and his wife of recovery. Here are the facts as I understand them from the record:

It was a light, clear, summer evening of good visibility. The Hesters, with Mr. Hester at the wheel, were driving to Pendleton, Oregon, to visit their daughter. Approaching State Primary Highway 125 on the Dalles Military Road in their Mercury Meteor automobile, at about 8 p.m., Mr. Hester stopped at the stop sign, looked to his left then to his right, and, accelerating in a right turn, drove onto the highway. His car had completed the turn and moved down the highway a short distance when defendant Watson's pickup truck, traveling westerly on Highway 125 between 55 and 60 miles per hour, rammed it violently in the rear.

Maximum legal speed on Highway 125 was 60 miles per hour.

The Hesters brought this action as plaintiffs, charging Mr. Watson with driving at an excessive speed under the prevailing conditions; failing to apply his brakes in time; failing to avoid the accident after seeing plaintiff in a position of danger; and operating a vehicle that would not properly respond to its brakes. Mr. Watson answered, accusing the Hesters of contributory negligence and cross-claimed for damages. From a judgment entered on the verdict against the plaintiffs and against the defendant on his cross complaint, thus awarding nothing, the Hesters appeal. Watson, as defendant and cross complainant, has filed no cross-appeal, thereby narrowing the scope of this review to an examination of plaintiffs' comparative rights and correlative duties.

Many of the issues confronting the trial judge left the case when defendant elected not to bring a cross-appeal. Accordingly, the question of defendant's negligence per se, and his right to recover on his cross complaint are not before us. The main issue on review, as I understand it, is whether plaintiff Huey L. Hester was contributorily negligent as a matter of law in failing to yield the right of way to a vehicle traveling on State Primary Highway 125 at nearly 60 miles per hour. If this be resolved affirmatively, the last clear chance issue becomes academic—unless, of course, the last clear chance doctrine may be said to inhere in nearly all multicar collisions.

Plaintiff Huey Hester's own testimony showed that he failed to allow a fair margin of safety in entering upon the arterial and thus failed to yield the right of way, and obviates any legitimate claim of deception or entrapment. He testified that not only was he aware of the oncoming pickup truck but actually saw it coming along the highway at a lawful speed before he left the stop sign to turn onto the highway. He could not, therefore, have been deceived or entrapped into disallowing a fair margin of safety. *Mondor v. Rhoades*, 63 Wn.2d 159, 385 P.2d 722 (1963).

Mr. Hester testified that "I come up to the stop sign there at [highway] 125 . . . and I looked both ways up and down the road. . . . I didn't see anything except Mr. Watson's truck coming up the road." Visibility was good; he could see a mile to his right, but saw nothing coming from that direction. He could see a long way to his left, he said, and there he did observe Mr. Watson's pickup truck. It was down the highway, just crossing the railroad track when he first noticed it:

> Well, just whenever I first pulled up to the stop I noticed when I pulled into the road. Just as I pulled into the road Mr. Watson bumped the railroad track. And I just pulled on in the road normally and done forgot about it, but he bumped us in the back.

He guessed that his car had moved 250 to 275 feet from the intersection before being hit. He was picking up speed, he said, but didn't know his speed at the moment of impact. "It might have been 20, 30. I just don't know." He repeated that, just as he started moving out onto the highway and turned right, he saw the pickup truck crossing the railroad track down the highway.

When asked on direct examination as to the pickup's speed, he answered:

> He appeared to be more in speed limits when I seen him coming there. He wasn't over speed limit I don't think. I couldn't say because I don't know.

On cross-examination, Mr. Hester said that he stopped about one car length from the stop sign; that his car had an automatic drive; that, as he was pulling out onto the highway, he saw the pickup truck on the highway bump over the railroad track; and that he entered and made a right turn, accelerating.

His testimony on both direct and cross-examination leaves no doubt that he saw and appreciated the approaching pickup before entering the highway. On cross-examination, he said:

> A. . . . The last time I seen him I was just looking around to the side like that (indicating), and he was way down the road, so it was a surprise to me when he hit

me, that's all. Q. He was bumping over the railroad tracks? A. That's when I first started into the road. Q. When you first pulled out? A. When I first began to ease onto the road, he was crossing the railroad track. When I looked back, he was still coming on up. He was way back behind me. I just kept easing up the road.

State Trooper Kenneth E. Graves of the Washington State Patrol, who had special training in accident investigation, arrived at the scene of the accident about 10 minutes after it happened. He said, "It was clear, sunshiny and good visibility." The sun, he said, would have been to the right and not directly in front of the two drivers. He determined the approximate point of impact from the presence of glass, mud and other debris, jarred loose on the highway, and some gouge marks on the pavement. By pacing, he calculated that impact occurred 225 feet from the intersection. Using the odometer in his police car, Trooper Graves computed the distance from the railroad track to the center of the intersection at 1,056 feet.

Trooper Graves testified that the defendant, Mr. Watson, told him he had been traveling 55 to 60 miles per hour, saw the Hester car pull up to the stop sign, looked into his rearview mirror, and when he was about 100 feet from the intersection the Hester car pulled out in front of him giving him no time to avoid the collision. Concerning statements made by the plaintiff, the officer said Mr. Hester told him his car had reached 40 or 45 miles per hour at impact.

Mr. Watson, the defendant, said he was driving his pickup truck within the speed limit, about 55 to 60 miles per hour, and first noticed the Hester car when he was approximately 500 feet from the intersection. The Hester car was just pulling up to the stop sign. Mr. Watson testified:

Q. Had he arrived at the stop sign yet when you first saw him? A. No. Q. So then what did you do? A. Well, I just as normal driving I checked the road, and then I looked back in the rearview mirror to see if anybody was coming behind.

After checking his rearview mirror, he looked to his front and suddenly there was the Hester car in front of him. He

"started to apply the brakes, and then the collision occurred." He thought the cars were about 100 to 150 feet west of the intersection at impact. He was knocked unconscious in the accident.

Some of the conflicts in the testimony were reconciled by the undisputed evidence of a land surveyor, Mr. George M. Newbill. With a tape measure, he measured various distances on the highway and prepared a scale map thereof. The distance from the center of the railroad tracks crossing Highway 125 to the stop sign proved to be 1,138 feet. In the vicinity of the accident, the highway was 24 feet wide, divided by a center line, making two 12-foot lanes and with a shoulder on each side nearly a lane wide.

The defendant called as his witness a mathematician from Whitman College, Mr. Jerry Purcell. Mr. Purcell held a master's degree in mathematics and taught calculus, numerical analysis and introductory programming at the college. His testimony illustrates the fallacies inherent in snap judgments, fleeting glimpses and split-second impressions and the vagaries of mathematical calculations based thereon. Applying one set of variables, Mr. Purcell testified that a car traveling 60 miles per hour moves 88 feet per second and 81 feet per second at 55 miles per hour. If Mr. Hester accelerated at a uniform rate from 0 to 40 miles per hour at impact, it would require 7.6 seconds for the Hester car to travel 225 feet. If Hester, in accelerating onto the highway, traveled 225 feet in 7.6 seconds, then Watson, traveling at 55 miles per hour would be 390 feet from the intersection at the moment Hester left the stop sign in order to strike the Hester car 225 feet past the intersection. If, however, as Mr. Hester, the plaintiff, so categorically testified, the pickup was at the railroad tracks when Hester started up from the stop sign—1,138 feet away by surveyor's measurements—the Watson pickup would have to be traveling about 121 miles per hour to overtake and hit the Hester car within the 7.6 seconds it would take that car to cover 225 feet in accelerating to 40 miles per hour. Mr. Watson said he had never driven his pickup faster than 70 miles per hour.

But there are other applicable variables. For example, if Hester had accelerated to 30 instead of 40 miles per hour, it would take 10.2 seconds to go the 225 feet, requiring the pickup to be traveling 91 miles per hour to cover the distance from the railroad tracks and hit the Hester car within the same 225 feet of the intersection. The time Hester required to traverse a distance of 225 feet from the stop sign would depend on his rate of acceleration, which, in turn, could be calculated only if one knew the speed of the Hester car at the instant of impact. Each time the speed of the disfavored car is reduced, the longer the time involved and the less the speed necessary for the pickup to reach it from the railroad track.

These computations, of course, ignore several other possible variables inherent in high speeds and split-second computations, each of which affects the mathematical results. We do not know the kind of arc described by the Hester car as it left the stop sign and turned right, whether it swung over the center line or cut sharply toward the highway. The 225 feet was but an approximation arrived at by stepping it off with the exact terminal points indefinable. It could have been substantially greater or less in either direction. If substantially less, the 7.6 seconds required for the Hester car to accelerate to 40 miles per hour would be reduced, thus increasing the theoretical speed necessary for the Watson car to reach it from the railroad tracks even though it would travel a slightly shorter comparative distance. By changing the point of impact, we add a new variable, vitally affecting the space-time factors governing both cars at the time.

Or, we might consider another variable. Suppose, as now appears likely, Mr. Watson's pickup was not at the railroad tracks 1,138 feet away when Hester first saw it but much closer. A whole new set of variables would be introduced as to the margin of safety Hester allowed before starting from the stop sign. The less the actual distance, the less the margin of safety.

Of course, all of the computations in the case were based on a constant rate of acceleration by the Hester car, but

this was merely assumed and not proved. Mr. Hester, when asked about his speed at impact, said, "It might have been 20, 30, I just don't know." He said his automatic drive had two forward gears—but he had left it in "drive" and had acknowledged that possibly he had told the trooper that he was traveling 40 to 45 miles per hour at impact. Thus, a whole new set of variables could be introduced and each set would materially affect the result, highlighting the inherent fallacies of relying upon mathematical computation based on the split-second observations and impressions of eyewitnesses.

Unless mathematical computations are based upon a set of factors established with reasonable precision by the evidence, they will be as misleading in some respects as they are enlightening in others. Whether the truth can be shown in automobile accidents by resort to split-second impressions and space-time computations applied to varying factors is extremely doubtful. *Harmon v. Merrick,* 62 Wn.2d 171, 381 P.2d 614 (1963); *Greene v. Rothschild,* 60 Wn.2d 508, 374 P.2d 566 (1962); *Day v. Frazer,* 59 Wn.2d 659, 369 P.2d 859 (1962); *Vercruysse v. Cascade Laundry Co.,* 193 Wash. 184, 74 P.2d 920 (1938); *Scobba v. Seattle,* 31 Wn.2d 685, 198 P.2d 805 (1948).

Better then that the operative facts be derived from the entire picture of the events as described by all of the evidence and then subjected to the law governing it. If this is done here, Hester's contributory negligence becomes manifest as a matter of law under evidence deriving largely from his own uncontradicted testimony and with no latitude for application of either phase of the doctrine of last clear chance.

Plaintiffs rely principally on *Nelson v. Molina,* 53 Wn.2d 412, 334 P.2d 170 (1959)—a precedent which, in my opinion, rests not only on doubtful and tenuous premises, but also differs in some degree from the instant case. There the accident occurred at night, and both vehicles had their headlamps burning; here it was daytime and visibility excellent. There, as here, one vehicle was approaching on an

arterial and the disfavored driver entered and turned right on to it, but there was some evidence in that case that the driver on the arterial was exceeding the legal limit of 50 miles per hour, whereas here there is no evidence whatever that the defendant was going more than the legal speed. And one final difference, in *Nelson v. Molina, supra,* a driver approaching the intersection on the arterial from a direction opposite that of plaintiff's said that plaintiff's car could have been two blocks from the intersection at the time defendant Molina entered the arterial.

Aside from these differences, however, I think that *Nelson v. Molina, supra,* should be overruled because it overlooks the rule of proximate cause and lays down two fallacious propositions: First, if one enters a 50-mile-per-hour arterial in a right turn and manages to complete a right turn within 60 to 100 feet of the intersection's center before being struck, he is then no longer a driver simultaneously approaching the intersection, but becomes a driver on an arterial highway in the process of being overtaken by a following car. This at best seems to me to be a preposterous doctrine and takes away the protection of the arterial right of way given by statute from the vehicle on the arterial and gives it to the entering car. The absurdity becomes even more apparent when one reads the rules of the road concerning the overtaking of vehicles as set forth in RCW 46.60.040 (superseded by RCW 46.61.110), which states:

> Any person driving a vehicle upon any public highway of this state and overtaking another vehicle proceeding in the same direction shall pass to the left of such overtaken vehicle: *Provided,* That it shall be unlawful for any person to pass any vehicle overtaken unless he shall have a clear and unobstructed view ahead for a distance sufficient for safe passing, all factors considered. Any person driving a vehicle upon any public highway and being overtaken by any vehicle proceeding in the same direction shall keep to the extreme right hand side of such public highway and shall not accelerate his speed until the overtaking vehicle shall have resumed a driving position and speed ahead of him. The overtaking vehicle shall drive clear of the overtaken vehicle and shall continue its overtaking speed until it has passed the overtaken vehi-

cle and shall have resumed its driving position to the right of such public highway. No person driving any vehicle upon any public highway outside incorporated cities and towns and overtaking another vehicle proceeding in the same direction shall overtake such vehicle or drive within a distance of less than fifty feet of such overtaken vehicle for such purpose without first signaling his intention to pass by use of horn or other sounding device.

The foregoing section means, I think, that the driver of the overtaken vehicle, *inter alia,* shall first ascertain that there are no oncoming vehicles and then, after overtaking and passing, shall return to his own lane at the earliest possible moment. If the law regards the defendant on the arterial highway in the instant case as engaged in overtaking and passing the plaintiffs, it also requires of him a driving skill in observing the overtaking and passing statute which in my judgment is not expected of the drivers in the Indianapolis 500.

The second premise which I suggest is a fallacy in *Nelson* is the judicial assumption therein that, if a pickup truck strikes another car traveling in the same direction in the rear end, knocking it off the highway, and lays down skidmarks approximately 219 feet long from the point of impact, these skidmarks are evidence of a speed markedly in excess of the lawful rate of 50 miles per hour. This is an assumption of fact which, in my opinion, the court is not entitled to make and did not support the court's holding in that case that the speed of the Nelson vehicle, even if exceeding the speed limit in some degree, was a proximate cause of a collision with a car entering at the intersection. I would, therefore, either overrule *Nelson v. Molina, supra,* as a matter of sound policy in the interest of safety on the arterial highways or else hold it inapplicable here.

The basic question here is how secure is the protection afforded drivers on an arterial highway. RCW 46.60.170 (Laws of 1961, ch. 12, § 46.60.170, now superseded by RCW 46.61.190 (2) ), states:

The operator of a vehicle shall stop as required by law at the entrance to any intersection with an arterial public highway, and having stopped shall look out for and give right of way to any vehicles upon the arterial highway simultaneously approaching a given point within the intersection, whether or not his vehicle first reaches and enters the intersection . . . . RCW 46.60.170.

One should note the categorical language of the statute directed to the driver about to enter an arterial highway: "and having stopped *shall look out for and give right of way to any vehicles upon the arterial highway.*" (Italics mine.) If two vehicles are *simultaneously approaching* a given point within an intersection and neither yields the right of way, the point at which they collide depends on their relative speeds and courses and possible evasive actions, and they will not necessarily meet within the boundaries of the intersection.

The driver on an arterial under this statute has a right to assume that he will be protected by the stop signs under the familiar rule that a favored driver has a right to assume that the disfavored driver will yield the right of way as required by law. *Golub v. Mantopoli,* 65 Wn.2d 361, 397 P.2d 433 (1964); *Kelsey v. Pollock,* 59 Wn.2d 796, 370 P.2d 598 (1962); *Massengale v. Svangren,* 41 Wn.2d 758, 252 P.2d 317 (1953). Conversely, the disfavored driver must assume that the favored driver on the arterial will expect the right of way to be yielded him by a vehicle approaching or stopped at the stop sign. The whole logic of the high speed arterial system—if there is any logic in it—depends on these rules. *Zahn v. Arbelo,* 72 Wn.2d 636, 434 P.2d 570 (1967). That is why, in my view, this case has no basis in law or fact for submitting the issue of last clear chance to the jury for there was no substantial evidence to establish that the defendant had a last clear chance to avoid the collision. The majority opinion, in my judgment, goes a long way toward abrogating the protection afforded by the arterial highway statute, for it implies that one driving upon an arterial has a duty to anticipate that a car stopped at a stop sign may enter prematurely. If this be the rule,

then, prudent drivers on an arterial are obliged to trade rights of way to keep within it, and should slow or stop their vehicles to let the entering car enter.

Finally, I think one ought not be heard to claim a deception based upon his mistakes in judgment or inadvertence. One is not deceived who sees or should have seen what was there to be seen. If the approaching car is there to be seen and a driver does see it, he is simply mistaken and mistakes are usually evidence of negligence. A driver entering upon an arterial should not be allowed to lift the onus of negligence unless he establishes that the arterial driver's negligence created a deception of such a marked character as to lure a reasonably prudent driver into the illusion that he had a fair margin of safety—that is a deception tantamount to an entrapment. *Mondor v. Rhoades,* 63 Wn.2d 159, 385 P.2d 722 (1963).

*Froemming v. Spokane City Lines,* 71 Wn.2d 265, 427 P.2d 1003 (1967), states the proposition this way, at 270:

It will be observed that the deception rule prescribes standards of care for both drivers. Two general requirements must be met before it will be applied: (1) There must be a "reasonably prudent" disfavored driver who is (2) deceived by the wrongful and negligent actions of the favored driver, which create a situation tantamount to entrapment. The disfavored driver must show proof of both before the defense may be presented as a question for the jury.

. . . .

That part of the deception rule which relates to the standard of care of the disfavored driver requires that he introduce testimony to the effect that he had an opportunity to observe and form an intelligent judgment of the speed of the favored driver, and that he actually did so. *Charlton v. Baker,* 61 Wn.2d 369, 378 P.2d 432 (1963); see also *Bowen v. Odland,* 200 Wash. 257, 93 P.2d 366 (1939).

Plaintiff Huey Hester, testifying that he stopped, looked to his right and left, and then saw the approaching pickup truck crossing the railroad track down the highway, acknowledged that he saw the Watson pickup truck coming along the arterial. He knew or was charged with knowing

944

that the highway he was about to enter was an arterial and had a maximum allowable speed of 60 miles per hour. Seeing the approaching Watson car and knowing or being charged with knowing that it could be lawfully traveling on a clear, dry day at speeds up to 60 miles per hour, he was obliged to stop and yield it the right of way—either letting the Watson car pass safely or entering the arterial highway sufficiently ahead of it in time and distance to avoid an emergency. Plaintiff Hester's failure to do either, in my opinion, constituted contributory negligence as a matter of law, barring any right to recovery.

ROSELLINI and NEILL, JJ., and DONWORTH, J. Pro Tem., concur with HALE, J.