[No. 7538-1-I.   Division One.   July 28, 1980.]

CANDACE J. MENDELSOHN, *Respondent,* v. MURRAY G. ANDERSON, ET AL, *Appellants.*

STEVEN C. DUPPENTHALER, *Respondent,* v. MURRAY G. ANDERSON, ET AL, *Appellants.*

*W. Ronald Groshong* and *McCutcheon & Groshong,* for appellants.

*Paul N. Luvera, Jr., Frank Atwood, Asmundson, Rhea & Atwood, John C. Belcher,* and *Voris, Belcher, Swanson & Lackey,* for respondent.

RINGOLD, J.—This is a personal injury action arising out of a traffic accident. After a jury trial, Steven Duppenthaler was awarded judgment of $3,150 and Candace Mendelsohn was awarded judgment in the amount of $143,700. Murray and Joann Anderson appeal the judgments entered upon these verdicts.

About 7 p.m. on March 24, 1977, Murray G. Anderson was driving a 1976 Honda Civic northbound on SR 539 approaching the Bellingham Business Park in Whatcom County. It was dark, there were no overhead lights, Anderson's headlights were on, and the 2–lane paved road was dry. Anderson was arguing with his passenger about making him late and getting him into trouble with his wife. There was evidence he was driving between 64 and 76 m.p.h. in a 35 m.p.h. zone.

Driving southbound in a Chevrolet Blazer was Steven Duppenthaler with his passenger, Candace Mendelsohn, who owned the vehicle. From about 250 feet north Duppenthaler signaled for a left turn into the Business Park. He and Mendelsohn observed the headlights of approaching cars, which appeared to be at a safe distance. Duppenthaler was traveling 15 to 20 m.p.h. as he began his left turn; he saw nothing to indicate that an oncoming car was traveling 64 to 76 m.p.h. After observing the approaching headlights, he looked to the left where he was going to turn and never looked back at the oncoming traffic before starting his turn and crossing the center line. As he entered the turn, Mendelsohn hit him and yelled, "Look out!" Duppenthaler looked back to his right and saw the Honda 20 feet away, beginning to slide into his vehicle.

The collision occurred in the middle of the northbound lane at the continuation of the north line of the driveway into the Business Park. There was evidence of dips in the road which, combined with the darkness, could have prevented recognition that an oncoming car was speeding. There was also evidence that the view was totally unobstructed by dips or other barriers from 110 feet north of the impact site to 217 feet south. Nonetheless, there was also testimony that a car traveling at 65 m.p.h. moves 300 feet in about 3.1 seconds.

Anderson, the driver of the northbound Honda, was intoxicated and was found negligent as a matter of law prior to trial. Duppenthaler told a state trooper that as he began his turn he did not see any northbound vehicles because of headlights in his eyes. He also testified in a deposition admitted at trial that the Honda was there to be seen, but he did not see it.

As a result of the collision, Anderson's passenger was killed. Mendelsohn sustained injuries to her head, face, jaw, and teeth, while Duppenthaler's injuries were less serious. The jury found for the plaintiffs but also found that Duppenthaler was 10 percent contributorially negligent. Prior to trial, Mendelsohn entered into a covenant with Duppenthaler by which she received $10,000 from him for her injuries so the trial court reduced her judgment against Anderson by that sum. She was awarded $143,700. Duppenthaler's award of $3,500 was reduced according to the verdict of 10 percent contributory negligence to the sum of $3,150.

### JUROR MISCONDUCT
Anderson contends that there was juror misconduct during deliberations because one juror, who during deliberations reported that her son–in–law had sustained a serious head injury but suffered no seizures, had failed to reveal this fact during voir dire. The jury questionnaire asked whether any member of her immediate family or close friend had ever suffered serious bodily injury. The jury

panel was also asked whether any juror or close family member had suffered head or neck injury and nobody responded.

Anderson raised this issue in his motion for new trial or judgment n.o.v. and supported his motion by an affidavit of the one juror whose dissent prevented the verdict from being unanimous. No motion was made for a hearing at which the other jurors would be questioned regarding Ms. Palmer's statement, and the trial court, apparently discounting the credibility of this affidavit, convened no such hearing and ruled against the defendant. We are in no position to reevaluate the trial court's determination.

The questions asked of Ms. Palmer did not alert her to a duty to disclose the information regarding her son–in–law. The juror questionnaire asked that she list all members of her family; the list names only her spouse and issue. A later question asked whether she or "members of [her] . . . immediate family, or close friends ever suffered serious bodily injury." Given the previous question, Ms. Palmer could easily have inferred that the term "immediate family" referred only to those individuals she had listed earlier. Later during voir dire the jury en masse was asked whether any "close family member" had had a head or neck injury. Again, Ms. Palmer may have felt that the term "close family member" would not include her son–in–law. Indeed, there was no showing at all whether the son–in–law was still in that relationship with Ms. Palmer. We conclude that the questions asked did not clearly alert Ms. Palmer to any duty to disclose the injury to her son–in–law.

■ Finally, Anderson has demonstrated no prejudice resulting from this alleged juror misconduct. The implication of the juror's revelation would be that since her son–in–law had suffered no seizures, then neither would Mendelsohn, and that, therefore, Mendelsohn should not be compensated for that remote possibility. Compare the withheld information in *Smith v. Kent,* 11 Wn. App. 439, 449, 523 P.2d 446 (1974):

Juror Maude's arguments in the jury room supporting defendant's version of how the accident occurred, buttressed by reference to his trucking and driving experience, may well have brought about the 10–to–2 defendant's verdict characterized by the court as one that "shocked" and "dumbfounded" him.

Here, not only would any possible prejudice resulting from the juror's undisclosed fact inure to the benefit of the defendant, but also the verdict was in no way unfair.

## DECEPTION INSTRUCTION

Anderson argues that the trial court erred in instructing the jury as follows:

If the on coming driver wrongfully, negligently, or unlawfully operates his vehicle in such a manner that it would deceive a reasonably careful driver making the left turn, so as to cause him to proceed forward on the assumption that he had a fair margin of safety, and if the driver turning left is in fact so deceived, then the right of way rule would not apply in favor of the on coming driver.

Such a deception instruction, Anderson contends, should be reserved for the extreme case tantamount to entrapment. *Mondor v. Rhoades,* 63 Wn.2d 159, 385 P.2d 722 (1963).

This question relates only to Anderson's liability to Duppenthaler and not to Mendelsohn. A driver intending to turn left must yield the right–of–way to any approaching vehicle close enough to constitute an immediate hazard. RCW 46.61.185. The oncoming driver is the favored driver under the circumstances and the primary duty to avoid a collision is upon the disfavored turning driver. *Watts v. Dietrich,* 1 Wn. App. 141, 460 P.2d 298 (1969). Deception by the favored driver will excuse the disfavored driver from his duty to yield the right–of–way but only when the deception is tantamount to an entrapment. *Gray v. Pistoresi,* 64 Wn.2d 106, 390 P.2d 697 (1964); *Axness v. Edwards,* 9 Wn. App. 780, 515 P.2d 174 (1973). Excessive speed on the part of the favored driver is not sufficient, by itself, to justify the submission of the issue of deception to the jury. *Tobias v. Rainwater,* 71 Wn.2d 845, 431 P.2d 156

(1967); *Axness v. Edwards, supra.* The deception rule is applicable when there is evidence that there was nothing to indicate that the favored driver was speeding when seen by the disfavored driver, but the rule would not apply where a disfavored driver does not actually see the favored driver. *Tobias v. Rainwater, supra; Axness v. Edwards, supra.* Furthermore, before the instruction is properly submitted to the jury, there must be evidence that would support a finding that the disfavored driver reasonably concludes he has ample time to complete his turn giving due regard to the maintenance of a fair margin of safety at all times. *Tobias v. Rainwater, supra; Axness v. Edwards, supra.* The court in *Axness* refused to apply the deception doctrine where the plaintiff disfavored driver saw the headlights of defendant's car for an instant when it was about 350 feet away and could not estimate its speed. Under such circumstances, the court concluded that "It can no more fairly be said plaintiff was deceived by a speed he could not observe than that he could be deceived by the driving of a car he could see at all." *Axness, supra* at 785.

Here, additional evidence was submitted on behalf of Duppenthaler, the disfavored driver. At 65 m.p.h. a car travels 300 feet in about 3.1 seconds. There was testimony that the darkness, lack of lighting, and the obstruction due to the dips in the road could have prevented recognition that an oncoming car was speeding. The jury could have fairly concluded that Duppenthaler observed Anderson's vehicle at a safe distance and entered his turn when he could no longer see the vehicle because of the conditions of the road. Unlike *Axness,* there were facts to warrant a conclusion that Duppenthaler had more than a fleeting glance at an oncoming car which would justify a reasonably careful driver making the left turn. Thus, there was evidence to support the instruction.

The trial court did not err.

## DUPPENTHALER'S NEGLIGENCE

Anderson also complains that the jury should have been instructed that Duppenthaler was negligent as a matter of law and that his negligence was a proximate cause of the accident. The jury could have found Duppenthaler was not negligent because there was evidence that the conditions deceived him into believing that a left turn was safe. The issue of proximate cause was disputed and an instruction such as Anderson's would have been improper.

## OTHER CLAIMED ERROR

■ Anderson contends that the trial court erred in refusing to instruct the jury to discount plaintiff's damages for future medical expenses and lost earning capacity to present cash value.

The instruction requested stated:

[T]he law requires that the jury discount, or reduce . . . to its present cash value, the amount of the anticipated future loss, by taking (1) the interest rate or return which a plaintiff could reasonably expect to receive on an investment of the lump sum payment, together with (2) the period of time over which the future loss is reasonably certain to be sustained; and then . . . deduct from, the total amount of anticipated future loss whatever that amount would be reasonably certain to earn or return. . . .

The requested instruction lacked any mention of a formula for determining present cash value, or any indication what interest rate to apply.[1] Further, there was no evidentiary basis for such determination. In an analogous situation, our Supreme Court held:

As requested, [the] instruction . . . only defined what present cash value was and omitted the second paragraph of WPI 34.02 which would have given the jury a basis upon which to determine that value. The omission of this paragraph from the instruction, and the absence of any evidence providing a guide for the jury, left the jurors

---

[1] WPI 34.02, which was also requested, does not cure the absence of evidentiary support for submission of the issue to the jury.

with no evidence or guide from which to determine the appropriate rate of interest to apply. This was a fatal omission, the requested instruction was therefore erroneously incomplete, and the court did not err in refusing the instruction.

Even had the instruction been given in full . . . additional testimony might well have been requested to establish the appropriate mathematical formula to be applied. At the time this testimony was introduced, or at such other time as deemed appropriate by the plaintiff, the plaintiff could also have produced evidence proving to what extent, if any, the reduction of future earnings to present cash value might be offset by a change in the probable reduced value of money at given periods of time in the future.

*Hinzman v. Palmanteer,* 81 Wn.2d 327, 336, 501 P.2d 1228 (1972).

In the present case there was no such evidentiary basis for the proper formula interest rate to be applied. Further, we take judicial notice of the fact that inflation diminishes the value of money in an amount approximately equal to that which money, prudently invested, would earn. *Cf. Kellerher v. Porter,* 29 Wn.2d 650, 666, 189 P.2d 223 (1948).[2] Any difference would be de minimis, not warranting reversal and a new trial for damages. The verdict was fair, and not the product of passion or prejudice. The trial court did not err in denying the instruction.

We have considered Anderson's other alleged errors and we are unpersuaded that the trial court erred.

The judgments on the verdicts are affirmed.

SWANSON, J., concurs.

DORE, J. (concurring in part; dissenting in part)—I would affirm the judgment on liability but remand the case to the

---

[2]ER 201. The Alaska court, observing the practical reality of modern day economic conditions, has rejected the rule requiring reduction of awards for future loss to present value. *Beaulieu v. Elliott,* 434 P.2d 665 (Alaska 1967). Treatise writers also have decried the beguiling logic of the rule. J. Stein, *Damages and Recovery, Personal Injury and Death Actions* § 170, at 330 (1972).

trial court for a retrial on the issue of damages. It was prejudicial error for the trial judge to refuse appellants' instructions through which plaintiff's damages for future medical expenses and lost earning capacity would have been discounted to present cash value.

The appellants requested two instructions on this issue. Requested instruction No. 20 is quoted substantially in the majority opinion. Requested instruction No. 21,[3] also refused and excepted to, was based on WPI 34.02, and is set out in the margin. Plaintiff argues that impaired earning capacity is a general damages item and not reducible to present cash value. Plaintiff asks us to distinguish such losses from lost wages, a special damages item which is reducible to present cash value.

We agree that wages lost are distinct from diminished earning capacity. The difference, however, is merely one of time.

> [T]here are normally two components or aspects which should be considered in attempting to measure the detriment an injured plaintiff has sustained when by reason of the injury he is unable to continue earning his prior wages. The first and most obvious component is frequently called "lost time," "lost wages," or "lost earnings." That is, it is clear that if an injury renders a plaintiff temporarily unable to continue at a prior occupation for a given period, the plaintiff should be entitled to compensation for regular wages lost because of the disability. Secondly, when it becomes apparent that an injury was such that it occasioned a permanent disability, or permanent diminution of the ability to earn money,

---

[3] "'Present cash value' as used in these instructions means the sum of money needed now, which, when added to what that sum may reasonably be expected to earn in the future, will equal the amount of the loss at the time in the future when the expenses must be paid or the earnings would have been received.

"The rate of interest to be applied by you in making this determination would be that rate which in your judgment is reasonable under all the circumstances taking into consideration the prevailing rates of interest in the area which can reasonably be expected from safe investments which a person of ordinary prudence, but without particular financial experience or skill, can make in this locality."

then the plaintiff should be entitled to compensation for what is generally called "impaired earning capacity."

*Kubista v. Romaine,* 14 Wn. App. 58, 62–63, 538 P.2d 812 (1975), *aff'd,* 87 Wn.2d 62, 549 P.2d 491 (1976). Lost wages, then, will usually involve an income loss suffered up to the time of trial; "diminished earning capacity" will usually be those losses suffered thereafter. The difference between these terms will not affect the rule that future losses must be discounted to their present cash value.

The majority holds that instruction No. 20 was properly refused because it "lacked any mention of a formula for determining present cash value, or any indication what interest rate to apply." If this was the fatal flaw, it would have been corrected by the WPI instruction, instruction No. 21. That instruction, when given in its entirety as appellants here had requested, provides the jury a basis upon which to determine present cash value. *Bartlett v. Hantover,* 84 Wn.2d 426, 432, 526 P.2d 1217 (1974).

The plaintiff testified that due to her injuries she was no longer able to work a full 40–hour week. She was forced, instead, to accept employment at 20 to 30 hours per week. Such reduction in her earning capacity may well have been considered by the jury. There was also substantial testimony concerning the probability of the plaintiff's incurring future medical expenses. The failure to instruct the jury to reduce to present cash value those damages attributable to impaired earning capacity and future medical expenses is reversible error. *Wentz v. T.E. Connolly, Inc.,* 45 Wn.2d 127, 137, 273 P.2d 485 (1954) (case tried to court); *Kellerher v. Porter,* 29 Wn.2d 650, 673, 189 P.2d 223 (1948) (case tried to jury).

Finally, I strongly object to the majority's taking "judicial notice of the fact that inflation diminishes the value of money in an amount approximately equal to that which money, prudently invested, would earn." If the question of purchasing power of money is to be determined in a court

of law,[4] it is proper when placed in the province of the fact finder. *Hinzman v. Palmanteer*, 81 Wn.2d 327, 336, 501 P.2d 1228 (1972); *Sadler v. Wagner*, 5 Wn. App. 77, 85, 486 P.2d 330 (1971).

I would grant a new trial on the sole issue of damages and require that the jury be instructed on the discount factor as to damages awarded for future medical expenses and diminished earning capacity.

Reconsideration denied September 18, 1980.

---

[4]At least one court has rejected the rule of discounting future losses to present cash value in an effort to recognize modern economic realities. *Beaulieu v. Elliott*, 434 P.2d 665 (Alaska 1967). *See also* S. Speiser, *Recovery for Wrongful Death* § 3.4, at 35 *et seq.* (1970).